FILED by **IG** D.C.
ELECTRONIC

**AUG. 12, 2008**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.:

MICHAEL I. GOLDBERG, in his capacity
as court-appointed Receiver for Worldwide
Entertainment Group, Inc., a Delaware
corporation, The Entertainment Group Fund,
Inc., a Florida corporation, and other affiliated
entities,

      Plaintiff,

vs.

PARIS HILTON ENTERTAINMENT, INC., a
California corporation, and PARIS HILTON, an
individual,

      Defendants.

_____/

Ancillary Case No.: 06-20975-CIV-HUCK

# 08-22261-CIV-MARTINEZ/BROWN

## COMPLAINT

Plaintiff, MICHAEL I. GOLDBERG (the "*Receiver*"), in his capacity as court-appointed

receiver for Worldwide Entertainment Group, Inc., ("*Worldwide*"), The Entertainment Group

Fund, Inc., ("*TEGFI*"), and other affiliated entities, hereby sues the Defendants, PARIS HILTON

ENTERTAINMENT, INC., ("*PHEI*") and PARIS HILTON, an individual ("*Hilton*")(PHEI and

Hilton shall hereafter collectively by referred to as the "*Defendants*"), and alleges as follows:

### JURISDICTION, VENUE and THE PARTIES

1.     This is an action for damages wherein the amount in controversy exceeds Seventy

Five Thousand Dollars ($75,000.00), exclusive of interest, costs, and attorney's fees, and is

therefore within the jurisdiction of this Court.

2.     Worldwide is a Delaware corporation with its principal place of business in Miami Beach, Florida. TEGFI is a Delaware corporation with its principal place of business in Miami Beach, Florida. Worldwide, TEFGI and their affiliated entities are currently in receivership in a case pending in the United States District Court for the Southern District of Florida (the "*Court*") styled: *Securities and Exchange Commission v. John P. Utsick, et al.*, Case No. 06-20975-CIV-HUCK.

3.     On April 20, 2006, the Court appointed the Receiver as the receiver for Worldwide, TEGFI, and their affiliated entities, and authorized and directed the Receiver to marshal assets for the benefit of the creditors of the receivership estates (the "*Receivership Order*").

4.     At all times material hereto, Defendant PHEI was and is a California corporation with its principal place of business located in Los Angeles County, California and is otherwise subject to the jurisdiction of this Court.

5.     At all times material hereto, Defendant Hilton was and is a resident of Los Angeles County, California, is over the age of eighteen (18) years, and is otherwise subject to the jurisdiction of this Court.

6.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 754 and 1692.

7.     This complaint is brought to accomplish the objectives of the Receivership Order and is thus ancillary to this Court's exclusive jurisdiction over the receivership estate. Pursuant to the principles of ancillary jurisdiction or supplemental jurisdiction under 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the claims set forth herein. Moreover, the underlying agreement upon which this lawsuit is based was performed to a large extent in Miami

2

TEW CARDENAS LLP
Four Seasons Tower, 15th Floor, 1441 Brickell Avenue, Miami, Florida 33131-3407 • 305-536-1112

Beach, Florida, and a substantial part of the events or omissions giving rise to the claims occurred in the Southern District of Florida. Hence, venue is also proper in this Court.

8. The Court has personal jurisdiction over the Defendants pursuant to 28 U.S.C. §§ 754 and 1692.

9. This Court also has personal jurisdiction over the Defendants pursuant to Fla. Stat. § 48.193 in that Defendants, or their agents acting on their behalf, engaged in the following acts: operating, conducting, engaging in, or carrying on a business or business venture in Florida or having an office or agency in Florida; causing injury to persons or property within Florida arising out of an act or omission by the Defendants outside of Florida at or about the time when the Defendants were engaged in solicitation or service activities within Florida; and breaching a contract in Florida by failing to perform acts required by the contract to be performed in Florida. Furthermore, the Defendants were engaged in substantial and not isolated activity within Florida.

10. All conditions precedent to the bringing of the various claims set forth herein have been satisfied, discharged or waived.

## FACTUAL ALLEGATIONS

11. On June 3, 2004, Pledge This Holdings, LLC (the "*Assignor*"), a Delaware limited liability company, entered into an agreement with PHEI and Hilton (the "*Production Agreement*") for the production and distribution of a certain motion picture titled "National Lampoon's Pledge This!" (the "*Movie*"). A copy of the Production Agreement is attached hereto as Exhibit "A."

12. Pursuant to the Production Agreement, Assignor paid PHEI one million dollars and PHEI agreed to furnish Hilton's acting services and agreed to ensure that Hilton provided "reasonable promotion and publicity services" for the Movie.

3

13. Further, pursuant to the Production Agreement, Hilton, individually, agreed to perform "reasonable promotion and publicity services" for the Movie upon the Assignor's request.

14. On September 23, 2004, Assignor and Worldwide South Beach, LLC ("*WWSB*"), a wholly-owned subsidiary of Worldwide, entered into an Executive Producer and Financing Agreement, and several subsequent amendments thereto (collectively, the "*Financing Agreements*"), pursuant to which WWSB provided financing to Assignor for the production of the Movie and, in consideration, received rights to portions of the adjusted gross proceeds from the sale and the distribution of the Movie, all as more fully set forth in the Financing Agreements.

15. WWSB entered into the Financing Agreements based upon the Assignor having secured the Production Agreement with PHEI and Hilton.

16. Prior to and subsequent to the release of the Movie, Assignor requested PHEI and Hilton to fulfill their promotional obligations under the Production Agreement by having Hilton appear as a guest on various talk shows and attending in-person and/or telephonic interviews.

17. Despite Assignor's repeated requests to PHEI and Hilton through Hilton's agents, PHEI and Hilton failed to satisfy their obligation under the Production Agreement to promote the Movie.

18. Ultimately, despite the Assignor's repeated demands, Hilton failed to attend any talk shows or telephonic or in-person interviews.

19. On June 4, 2008, the Assignor and the Receiver entered into an Assignment Agreement whereby the Assignor assigned to the Receiver all of the Assignor's right, title and interest in and to any claims or causes of action (the "Claims") that Assignor may have against

4

TEW CARDENAS LLP
Four Seasons Tower, 15th Floor, 1441 Brickell Avenue, Miami, Florida 33131-3407 • 305-536-1112

PHEI, Hilton or any other party that arise out of, under or in connection with the Production Agreement (the "*Assignment Agreement*"). A copy of the Assignment Agreement is attached hereto as Exhibit "B." The Court authorized and approved the assignment of Claims to the Receiver. A copy of the Court's order approving the Assignment Agreement is attached hereto as Exhibit "C."

**COUNT I**
**BREACH OF CONTRACT AS AGAINST DEFENDANT PARIS HILTON**
**ENTERTAINMENT, INC.**

20.     The Receiver reasserts and reavers those allegations contained in paragraphs one (1) through nineteen (19) as if fully set forth herein.

21.     On June 3, 2004, PHEI entered into the Production Agreement with the Assignor regarding the Movie and therein agreed to furnish Hilton's acting services, including ensuring Hilton's reasonable promotion and publicity of the Movie.

22.     Assignor performed its obligations under the Production Agreement.

23.     PHEI received One Million Dollars ($1,000,000.00) as compensation in advance.

24.     PHEI breached the Production Agreement by failing to furnish Hilton's services in promoting the Movie.

25.     As a result of PHEI's breach, the Assignor has incurred damages including, but not limited to, lost revenue and profits based on the lack of promotion of the Movie.

WHEREFORE, the Receiver demands judgment for damages against Defendant Paris Hilton Entertainment, Inc., the reasonable attorney's fees and costs associated with the prosecution of this action pursuant to the Agreement, interest, and such other relief as this Court deems just and proper.

5

## COUNT II
## BREACH OF CONTRACT AS AGAINST DEFENDANT PARIS HILTON

26.     The Receiver reasserts and reavers those allegations contained in paragraphs one (1) through nineteen (19) as if fully set forth herein.

27.     On June 3, 2004, Hilton entered into the Production Agreement with the Assignor and therein agreed and accepted the terms thereof "insofar as [her] personal rights and obligations [were] concerned."

28.     Assignor performed its obligations under the Production Agreement.

29.     Pursuant to the Production Agreement, Hilton agreed to reasonably promote and publicize the Movie.

30.     Hilton breached the Production Agreement by failing to provide reasonable promotion and publicity services for the Movie.

31.     As a result of Hilton's breach, the Assignor has incurred damages including, but not limited to, lost revenue and profits based on the lack of promotion of the Movie.

WHEREFORE, the Receiver demands judgment for damages against Defendant Paris Hilton, the reasonable attorney's fees and costs associated with the prosecution of this action pursuant to the Production Agreement, interest, and such other relief as this Court deems just and proper.

6

Dated: <u>August 12, 2008</u>.

Respectfully submitted,

**TEW CARDENAS LLP**
Four Seasons Tower
1441 Brickell Avenue
15th Floor
Miami, Florida 33131
Telephone: (305) 536-1112
Facsimile: (305) 536-1116

By: _____
Thomas G. Schultz
Florida Bar Number: 92860
Email: tgs@tewlaw.com
Bryan T. West
Florida Bar No. 83526
Email: btw@tewlaw.com

511047v1

7

# EXHIBIT "A"

## DEAL MEMORANDUM (THE "AGREEMENT")

"Date":        June 3, 2004

"Parties":       Paris Hilton Entertainment, Inc. ("Lender") f/s/o
Paris Hilton ("Artist")
c/o United Talent Agency, Inc.
9560 Wilshire Blvd.
Beverly Hills, CA 90212
Attention:    Mr. Alex Schaffel
cc: Ziffren Brittenham
1801 Century Park West
Los Angeles, CA 90067
Attention:    Matthew Johnson, Esq. & P.J. Shapiro, Esq.

Pledge This, LLC ("Company")
c/o Cowan DeBaets Abrahams & Sheppard, LLP
41 Madison Avenue, 34th Floor
New York, New York 10010
Attention: Frederick P. Bimbler, Esq. & Robert L. Seigel, Esq.

"Picture":      Pledge This!

"Role":        "Victoria"

"Shooting Location": Metropolitan Miami/Ft. Lauderdale/Palm Beach, Florida

"Production Budget"  Currently estimated at $3,200,000

In consideration of the premises, the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.    Engagement; Start Date:    Company hereby engages Lender to furnish the acting services of Artist, and Lender hereby accepts such engagement for Artist to render acting services in the Role at the Location (and at such other post-production locations as Company may reasonably determine in consultation with Artist), on the terms and conditions set forth herein. Artist shall use Artist's best artistic efforts in a timely and professional manner in rendition of the acting services. Services hereunder shall commence on or about August _____, 2004 (such date not to be prior to August 7) (the "Start Date"). Artist shall be available to render services for one (1) consecutive week of pre-production immediately preceding the Start Date. Artist shall render services for up to five (5) consecutive six-day weeks of principal photography commencing on the Start Date (twelve hour turnaround portal to portal, but up to two free forced calls), the Parties acknowledging prior professional commitments in approximately the first two (2) weeks of September and agreeing to cooperate to accommodate Company's shooting schedule

1

and such prior commitments. Artist shall render acting services in connection with post-production of the Picture, including without limitation looping, dubbing and reshoots, subject to her prior professional commitments, up to four days of such to be without additional compensation, and such days in excess of four to be at $33,333 per day.

2.  Compensation:

a.  Guaranteed Compensation: As full and complete consideration for the services rendered and to be rendered to Company concerning the Picture and for the rights granted herein and provided Lender and Artist are not in material default hereunder, Lender shall be entitled to a fee of one million ($1,000,000) dollars (the "Guaranteed Compensation") on a pay-or-play basis, the amount of which shall be no less favorable than that accorded to any other cast member of the Picture. The Guaranteed Compensation shall be placed in escrow on or before July 1, 2004, pursuant to an agreement (including instructions to pay Lender on an equal weekly basis over the scheduled period of Artist's services) to be entered into between Company and the agent for such escrow, which shall be approved by Company; provided, however, Company hereby preapproves either United Talent Agency, Inc. and Ziffren Brittenham, et al. to be such escrow agent.

b.  Percentage Compensation: Provided Lender is not in material default hereunder and Artist has rendered the services to the Picture, Lender shall be entitled to receive 5% of 100% of Company's Adjusted Gross Proceeds. The form of contingent compensation and the definition of "Adjusted Gross Proceeds" accorded Lender shall be subject to good faith negotiation and shall be no less favorable for Lender than that accorded to any other percentage compensation recipient, including any producer, cast member, director and/or investor of Company and/or the Picture. The Parties acknowledge that in calculating Adjusted Gross Proceeds, Company shall be deducting the certified negative cost plus a premium of 30% thereof; the actual cost of prints and ads, if Company shall self-distribute; and any actual costs and expenses incurred and paid by Company in connection with exploitation of the Picture (i.e., sales agent fees, etc.). Company acknowledges that gross proceeds shall include all license and other fees received by or paid on the account of Company from the sales and rentals of videograms. Company agrees to use best commercial efforts for distributors of the Picture to pay Lender the proceeds due Lender hereunder, directly.

c.  Theatrical Distribution Bonus: If Company enters into an unconditional agreement with a third party whereby Company relinquishes control over its theatrical distribution rights for the United States and/or Canada to such third party, Artist shall be entitled to receive one hundred twenty-five thousand ($125,000) dollars.

d.  Audit Rights: Lender shall have the right upon reasonable notice and at Lender's sole expense, to have Lender's designated accounting professional inspect and copy Company's books and records related to the percentage compensation due Lender from the Picture. Such inspection shall occur at the place where Company's books and records are kept in the normal course of Company's business or at such other location as

2

Company shall designate. If Lender shall request and bear the cost, Company agrees to utilize its audit rights acquired under Company's agreement with any third party distributor, to the extent such rights are held by Company.

3.    Credit: Provided Artist appears recognizably in the Picture, Artist shall be entitled to credit as follows:

    a.    On-Screen in the main credit sequence, in first position among performers, above or before the title, in a size not less than 100% of any other individual credit.

    b.    In Paid Ads above or before the "artwork" title (if any), in first position, in a size of type not less than the greater of (i) 25% of the artwork title (excluding the phrase "National Lampoon's" or (ii) 100% of any other individual credit, subject to standard exclusions and exclusion exceptions.

    c.    In the billing block whenever and wherever a billing block is utilized, above or before the title, in first position, in a size not less than the greater of (i) 100% of the title appearing therein or (ii) 100% of any other individual credit, subject to standard exclusions and exclusion exceptions. Credit to appear on home video and other product packaging.

    d.    If any other individual shall receive mention in television, radio/audio ads and/or in connection with any other form of marketing or exploitation, Artist shall be entitled to like mention, in the same position as credit on-screen.

    e.    If the likeness any other cast member shall appear in the key artwork of the Picture, Artist's likeness shall also appear therein in a size and prominence that is not less than 100% of any other cast member appearing.

    f.    Casual or inadvertent failure by Company or any third party shall not be a material breach hereof if rectified prospectively to the extent practicable, promptly after receipt of Lender's notice of the same. Company agrees to contractually obligate third party distributors of the Picture for exploitations in the United States and Canada to the foregoing credit requirements and agrees to inform third party distributors of the Picture for exploitations outside the United States and Canada of the foregoing credit requirements.

4.    Travel, Accommodations & Expenses:    Whenever Company requires the presence of Artist more than fifty (50) miles outside of Los Angeles County, California, including the Shooting Location (each of such places referred to herein as a "Location") Artist shall be entitled to receive the following:

    a.    Round-trip, first class air transportation (three in connection with the Shooting Location to accommodate Artist's personnel body guard in- and out-bound and one return trip to Los Angeles during principal photography), if used.

3

b.     First-class hotel suite accommodation or, subject to Artist's approval, other first class living accommodations, the Parties acknowledging that Company is arranging exclusive use of a multi-bedroom penthouse apartment on South Beach for Artist's consideration while at the Shooting Location.

c.     exclusive first-class ground transportation to and from airports and from place to place on Location. In connection with the Shooting Location, Company shall provide a first-class sedan/SUV and driver for Artist's exclusive, twenty-four hour use, and Lender agrees that such shall be Artist's exclusive transportation in during principal photography, including off-periods while Artist is at the Shooting Location.

d.     a per diem of one hundred ($100) dollars.

e.     the reasonable fees and crew accommodations of Artist's personal body guard during all periods when Artist is at the Shooting Location for pre-production and principal photography, [to be paid on Company's payroll.] Lender agrees to disclose the cost of such and to reasonably cooperate with Company to ensure that such cost can be borne within the Production Budget.

f.     during all periods when Artist is at the Shooting Location for pre-production and principal photography, the exclusive use of an assistant, which assistant shall be subject to Artist's and Company's mutual, reasonable approval and may be a local-hire.

g.     Company shall not be obligated in connection with any other of Artist's personal requirements.

h.     No other cast member rendering services to Company on the Picture shall be entitled to more favorable travel, accommodations and expenses than those accorded Artist hereunder.

5.     Dressing Facilities:   On set, Artist shall be entitled to the exclusive use of a first-class dressing facility, including the usual and customary amenities thereof.  No other Company personnel shall be entitled to a more favorable dressing facility on-set, including cast, director and producers.   Subject to the limitations of the Production Budget, such dressing facility shall include a kitchen with refrigerator and microwave, a bed, bathroom, TV, VCR, DVD player, heat/AC, phone and cellular phone installed in PH's name (basic service paid by production).  Facility also to included beeper and fax machine (with installation, basic services, rental, supplies and fax costs to be borne by Producer).

6.     Stills/Renderings:

a.     Stills:  Artist shall have the right, not to be unreasonably withheld, to approve all stills of Artist used for any purposes hereunder; provided, however, that Artist shall approve at least fifty percent (50%) of all such stills submitted to Artist in

4

which Artist appears. All such stills shall be submitted in groups of reasonable size and will be in the form of so-called "contact sheets", with good faith efforts for at least snap-shot size prints. If Artist fails or refuses to approve the requisite number of stills so submitted within five (5) business days after their receipt by Artist, Company may select any number of stills on Artist's behalf.

     b.    <u>Renderings:</u>   Artist shall have the right, not to be unreasonably withheld, to approve all proposed non-photographic renderings of Artist. Artist will be provided with up to three (3) passes (five (5) business days for each pass, failing response, such version shall be deemed approved) of each rendering ("Approval Rights"). Company agrees to use its good faith best efforts to remedy objections Artist may have to such renderings; provided however, that after Artist's Approval Rights have been fully exercised, Company may utilize the last version of such rendering without further approval from Artist.

     c.    <u>Restrictions:</u>  Neither stills nor renderings shall be submitted to any tabloid publication. Company is hereby prohibited from digitally altering (or authorizing or permitting any other party to digitally alter) any still or likeness hereunder and from digitization of Artist for performance for use outside of the Picture as released and marketed. All disapproved stills and likenesses and any screen test, make-up test or special effects test of Artist and any copies thereof, whether on film or tape and whether visual and/or audio shall be destroyed when no longer needed in connection with the Picture (but in no event later than the completion of post-production). Approvals of stills and renderings, once given, shall be final and binding, but any use of any stills or renderings not specifically approved in connection with key art or magazine covers, shall be subject to Artist's reapproval in accordance with paragraph 6.a. or 6.b., as applicable.

7.    <u>Approvals/Consultations:</u>    Artist shall be entitled to the following approvals and consultations:

     a.    Approval not to be unreasonably withheld or delayed over Artist's make-up artist, hairdresser and wardrobe personnel; changes to the Picture's screenplay that materially affect the Role; the Picture's director (Will Heinz is hereby pre-approved) and any replacements; the Picture's key cast and any replacements; behind-the-scenes footage, outtakes or bloopers; Artist's biography approval; incorporation of Artist's performance onto soundtrack recording; licensing of clips from the Picture (except in advertisements for and promotion of the picture, including without limitation trailers) containing Artist; and any Artist nudity (or doubled nudity) or Artist simulated sex scenes (or doubled simulated sex scenes) in the Picture. Artist shall have seventy-two (72) hours from receipt by Lender and/or Artist (receipt being deemed to have occurred if such notice is delivered to Artist personally, to Artist's agent and/or to Artist's attorneys) of the applicable matter in writing, in which to approve or disapprove such matter. Should Artist fail to respond within such period, such failure shall be deemed an approval. Approvals once given shall be final and binding.

5

b. Artist shall be provided with as much advance notice as is practicable concerning occasions when press shall be on the set.

8. Merchandising; Commercial Tie-Ins: Artist shall have the right to approve the use of her name, voice and likeness, in-character, in merchandising and commercial tie-ins. Artist shall be entitled to receive 5% of 100% of net merchandising receipts derived from merchandising uses containing Artist's name, voice and/or likeness. Net Merchandising Receipts shall be defined on a basis no less favorable than the definition of such accorded to Company, any individual producer, any other cast member and Company's investors.

9. Additional Artist Benefits

a. Wardrobe: Artist shall be entitled to purchase her wardrobe (to the extent Company owns the same) at the fair market value of the same.

b. DVD/Video: Artist shall be entitled to receive one videocassette and one DVD of the Picture when each such media is released to the public, for Artist's personal, non-commercial use.

c. Dubbing/Doubling: Artist shall be accorded the first opportunity to render English-language dubbing and doubling in connection with the Role.

d. Premieres: Artist shall be invited to the East and West Coast premieres of the Picture and all celebrity premieres and film festivals to which any other cast member shall be invited, and Artist agrees to attend the same, subject to her prior professional availability, Lender agreeing to cooperate with Company in scheduling of United States celebrity premieres. For premieres and festivals at a distant Location to which Artist is invited, Artist and a guest shall be entitled round-trip first class air transportation (if used), one first class hotel suite and a per diem for one of $100 per day.

10. Name & Likeness; Promotion; Publicity Restrictions

a. Name & Likeness: Subject to the restrictions set forth herein, Company, its licensees and assigns, shall always have the right to use and display Artist's name and approved likeness for advertising, publicizing and exploiting the Picture and the services of any distributor of the Picture (solely in-context of the Picture) or any results and proceeds of Artist's services.

b. Promotion; Publicity Restrictions:

i. Artist agrees that, upon Company's request Artist shall perform reasonable promotion and publicity services, with respect to the Picture including, without limitation, the making and exploitation of so-called "behind the scenes" motion picture documentaries and electronic press kits (which shall be created during principal photography of the Picture), subject to Artist's professional availability and subject to Artist's reasonable approval of behind the scenes interviews, such approval not to be unreasonably withheld or delayed (and such approval to be exercised in the manner set

6

forth in paragraph 7.a. hereinabove). Such services shall not be separately compensated, provided that if such services are rendered more than fifty (50) miles outside of Los Angeles County, California, Company shall furnish Artist with round-trip first class air transportation, if used, first class hotel suite, if used and a per diem of $100, in relation thereto. Artist shall have the right, not to be unreasonably withheld, to approve specific publicity services, subject to the approval process set forth in paragraph 7.a. hereinabove.

    ii.  Artist shall not, individually or by means of press agents or publicity or advertising agencies, employed or paid by Artist or otherwise, circulate, publish, or otherwise disseminate any news stories or articles, books, photographs, or other publicity, or material, containing Artist's name and relating directly or indirectly to Artist's employment, the subject matter of this Agreement, the Picture or the services to be rendered by Artist or others in connection therewith, or related directly or indirectly to Company, unless same are first approved in writing by Company. Notwithstanding the foregoing, Artist may release publicity about Artist which makes non-derogatory incidental reference to the Picture, and the Parties shall have mutual approval over the initial press release concerning this Agreement.

11. Screen Actors Guild: All terms contained herein shall be subject to the terms of the applicable SAG Codified Basic Agreement, as amended, and the applicable SAG Theatrical Contract, such terms shall supersede or replace any inconsistent terms contained herein. Company warrants and agrees that it is or shall be prior to commencement of principal photography a signatory of the applicable SAG Agreements. Company agrees to make pension, health and welfare payments directly to SAG.

12. Notices: Any notice to be given hereunder shall be in writing and shall be forwarded to the respective Parties at their addresses listed herienabove, which addresses may be changed by providing written notice of the same. Copies of all notices to Lender shall be concurrently forwarded by fax to Ziffren Brittenham, et al. 1801 Century Park West, Los Angeles, CA 90067, Attention P.J. Shapiro, Esq., Facsimile No. 310-553-7068. Copies of all notices to Company shall be concurrently forwarded by fax to Cowan DeBaets Abrahams & Sheppard, LLP, 41 Madison Avenue, New York, New York 10010, Attention: Frederick P. Bimbler, Esq. and Robert L. Seigel, Esq.

13. Standard Terms and Conditions: Schedule 1, Standard Terms & Conditions, annexed hereto and made a part hereof by reference, forms an integral part of this Agreement. By signing below, the Parties agree to each and every term therein. To the extent the terms of the STC are inconsistent with the terms of this Agreement, the terms of this Agreement shall prevail.

14. General:

  a.  Lender and Artist shall be named as additionally insured (by certificate only) on Company general liability and errors & omissions insurance policies, when and if acquired. In the event that so naming Lender and Artist shall require a payment in

addition to the standard premium, Lender shall reimburse Company for such additional payment or instruct Company not to so name Lender and Artist.

b. If Company shall desire to release the Picture non-theatrically (i.e. on video) in the United States/Canada prior to the Picture's general theatrical release, Artist shall have the right to approve the same, such approval not to be unreasonably withheld and to be subject to the approval process set forth in paragraph 7.a.

IN WITNESS WHEREOF, the Parties, intending to be bound have hereunder set their hands as of the Date, thereby constituting this the binding agreement between them with respect to the subject matter hereof.

PLEDGE THIS, LLC ("Company")

By Juan Carlos Zapata
An Authorized Signatory

PARIS HILTON ENT., INC. ("Lender")

By Paris Hilton
An Authorized Signatory

AGREED TO AND ACCEPTED INSOFAR AS MY PERSONAL RIGHTS AND OBLIGATIONS ARE CONCERNED:

PARIS HILTON ("Artist")

8

Standard Terms and Conditions ("STC") of the agreement dated as of June 3, 2004 (the "Agreement") between Pledge This, LLC ("Company") and Paris Hilton Entertainment, Inc. ("Lender") furnishing the services of Paris Hilton ("Artist"). To the extent the terms of the STC are inconsistent with the terms of the Agreement, the terms of the Agreement shall prevail

1.　　UNDERLINE INSURANCE:

　　　　(a)　Company may secure life, health, accident or other insurance covering Artist, or Artist and others, and Artist shall not have any right title or interest in or to such insurance. Artist shall, if requested by Company, assist Company in procuring such insurance by submitting to the usual and customary medical and other examinations (at which Artist may have his personal physician present at his sole expense) and by signing applications and other instruments in writing as may be reasonably required by any insurance company to which application for such insurance may be made. If insurance covering Artist cannot be obtained for customary premiums and deductions and without substantial exclusions, Company may terminate this Agreement; provided, however, that Artist shall have the right to pay any premium in excess of the customary premium, that such premium is timely paid, there are no additional or increased deductibles and the coverage is substantially similar to customary coverage and provide further that once Artist commences services hereunder, said termination right shall be ineffective.

　　　　(b)　Artist hereby warrants and undertakes to the Company that Artist is, not now nor has at any time been, subject to or suffering from any disability (as defined below) which could reasonably be anticipated to or in any way prevent Artist from rendering Artist's services hereunder; that Artist will, at all times hereafter, do all that is reasonably proper and necessary to maintain such a sound state of heath as will enable Artist to fully perform Artist's services hereunder and that upon becoming aware that Artist may or will suffer any such disability or contemplated disability, Artist will forthwith give notice thereof in writing to Company. The expression "disability" in this Agreement shall mean any malady, ailment, injury, illness and the like (including substance abuse)

　　　　(c)　Company warrants and undertakes to provide Workman's Compensation Insurance for the Artist. Company warrants and undertakes to maintain standard third-party liability insurance in connection with the production of the Picture, coverage of which shall extend to cast (including Artist) and crew and a copy of which shall be made available to Artist upon request. The foregoing is subject to any applicable exclusion and/or deductions contained in the applicable insurance policies

2.　　RESTRICTIONS:　　　　During the term hereof, Artist shall not (i) without the prior written consent of Company, order goods or incur any liability on Company's behalf or in any way pledge Company's credit or hold himself out as being entitled to do so or pay or agree to pay any bonus to any person engaged for or in connection with the production of the Picture; (ii) engage in any hazardous or dangerous pursuit or voluntarily take any risks the taking of which might prevent Artist from being able and ready to perform Artist's services whenever called upon by Company hereunder or which would invalidate or affect any normal policy of insurance on the life or health of the Artist; and in particular, Artist shall not fly on any aircraft other than as a passenger on a regularly scheduled commercial flight or on a private jet piloted by a licensed professional pilot (other than Artist), without Company's prior written consent.

3.　　RIGHTS:

　　　　(a)　Company hereby is and shall be the sole and exclusive owner and is and shall be the sole author for all purposes (including under the Copyright laws of the United States), in perpetuity and throughout the universe, of (i) all right, title and interest in and to the Picture (including without limitation,

9

the copyright in and to the Picture and all renewals and extensions thereof) and all result and proceeds of Artist's engagement and services under this Agreement or otherwise relating to the Picture ("Results and Proceeds") (all of which Results and Proceeds shall be a "work made for hire" for Company prepared within the scope of Artist's employment and/or as a work specially ordered or commissioned for use as part of a motion picture or other audio-visual work), and all so-called "moral rights of authors" or "Droit Moral" rights (and/or any similar or analogous rights under any applicable law of any jurisdiction) with respect to all the foregoing, and the right to make such changes therein and/or uses thereof as Company shall from time to time determine in its sole discretion; (ii) all distribution, exhibition, exploitation, allied, ancillary, related and/or subsidiary rights with respect to the Picture and/or the Results and Proceeds in any and all media, whether now or hereafter known,; and (iii) all other tangible and intangible rights of any nature relating to, and all proceeds and benefits of any nature derived form, the Picture and/or the Results and Proceeds. Without limiting the foregoing, in the event that any of the Results and Proceeds are not deemed to be a "work made for hire" for Company, Artist hereby irrevocably and exclusively assigns to Company (or if any applicable law prohibits or limits such assignment, Artist hereby irrevocably licenses to Company) all right, title and interest in and to such Results and Proceeds (including all copyrights therein and thereto and all renewals and extensions thereof), and all rights to exploit the some throughout the universe, in perpetuity, in any and all media, whether now known or hereafter devised. Artist hereby waives any so-called "moral rights of authors" and "droit moral" rights (and any similar or analogous rights under the applicable laws of any country of the world) which Artist may have in connection with Picture or the Results and Proceeds. Artist further hereby irrevocably assigns to Company (or if any applicable law prohibits or limits such assignment, Artist hereby irrevocably licenses to Company), in perpetuity throughout the universe, all of the Artist's rights, if any, to authorize, prohibit and/or control the renting, lending, fixation, reproduction and/or other exploitation of the Picture by any media and/or means now known or hereinafter devised as may be conferred upon Artist under applicable laws, regulations or directives, including, without limitation, any so-called "Rental and Lending Rights" pursuant to any European Union ("EU") directives and/or enabling or implementing legislation, laws or regulations enacted by the member nations of the EU. Artist hereby acknowledges that the Compensation payable to Artist hereunder includes adequate renumeration for all rights granted to Company pursuant to this Agreement, including without limitation all of Company's rights in and to the Picture and the Results and Proceeds. Notwithstanding any provision of this Agreement to the contrary, neither Company nor its successors or assignees shall be obligated to utilize Artist's services or the Results and Proceeds in or in connection with the Picture or to develop, produce, release, market, distribute or exploit the Picture.

(b) Subject to the terms and conditions set forth in the Agreement, Company shall have the right, throughout the universe, in perpetuity, and in part and in all media, to use and reproduce, and to license others to use and reproduce Artist's name, voice, approved likeness and biography (such biography to be in a form furnished or pre-approved by Artist) in connection with the production, exhibition, advertising, promotion, and/or other exploitation of the Picture, and/or the services of any distributor of the Picture (solely in-context of the Picture), and/or subsidiary and ancillary rights of any nature relating thereto and/or Artist's services hereunder, in any and all media, whether now known or hereafter devised, (including, without limitation, in connection with interviews, features, promotional films, and so-call "behind the scenes" programming, and in the advertising or publicizing of any commodities, products or services relating to the Picture, provided, that Artist shall not be represented as using, consuming or endorsing any commodity, product or service with Artist's prior written consent). Nothing contained in the Agreement and/or the STC shall be deemed to permit Company to utilize the Results & Proceeds in connection with more than one motion picture (including multiple cuts thereof and its attendant advertising and promotional materials (including behind the scenes programming).

7.    NO OBLIGATION: Nothing in this Agreement shall obligate Company actually to utilize Artist's services or to exploit the results and proceeds of Artist's services hereunder or to produce or exploit the Picture. If Company elects not to utilize Artist's Services, payment to Artist of the Guaranteed Compensation, specified herein, constitutes discharge in full of all of Company's obligations to Artist under this Agreement. There is no guarantee of any compensation other than the Guaranteed Compensation. The terms of this Paragraph 7. shall be subject to the terms and conditions of this Agreement relating to Company Disability, Artist Incapacity, and Artist Default. If Artist renders exclusive artistic services in the entertainment industry during the period of time when Artist would have been rendering services for which

10

Artist is paid the Guaranteed Compensation, if any, then all monies earned by Artist for such services shall be applied against and reduce the Guaranteed Compensation, if any, payable to Artist.

8.    FORCE MAJEURE:

(a)    Suspension: If, by reason of fire, earthquake, labor dispute or strike, act of God or public enemy, any municipal ordinance, any state or federal law, governmental order or regulation, or other cause beyond the control of Company, Company is prevented from or hampered in the production of the Picture, or if, by reason of any of the aforesaid contingencies, the preparation, commencement, production or completion of the Picture is hampered, interrupted or interfered with ("Company Disability"), then, provided that the services of all other performers in the Picture are similarly postponed or suspended, Company may postpone the commencement of or suspend the operation of this Agreement with respect to the rendition of services by Artist and the running of time hereunder for such time as the Company Disability shall continue. No compensation shall accrue or become payable to Artist hereunder during the period of such suspension. Such Force Majeure suspension shall end not later than one (1) week following the cessation of such Company Disability. There shall be no more than one suspension in connection with any one event of force majeure.

(b)    Termination:

(i)    Company Termination Right: If a Company Disability continues for a period in excess of 8 consecutive weeks, Company shall have the right, upon notice to Artist, to terminate this Agreement, provided the services of all performers in the Picture are similarly terminated. Notwithstanding the foregoing, if Company in its sole discretion, decides to recommence production of the Picture, Company shall provide Artist with written notice offering Artist the right to reinstate the date when principal photography is to recommence (the "Recommence Notice"). In the event that (i) Artist notifies Company in writing that Artist is unable or unwilling to recommence principal photography of the Picture on the date set forth in the Recommencement Notice; or (ii) Artist fails to respond in writing within five (5) days of Artist's receipt of the Recommencement Notice, Company may engage another performer to play the Role in the Picture upon terms and conditions determined by Company, in its sole discretion, and shall have no further obligation to Artist except as set forth in Paragraph 11 below.

(ii)    Artist's Termination Right: If a Company Disability results in compensation being suspended hereunder for a period in excess of four (4) consecutive weeks, Artist shall have the right, upon written notice to Company, to terminate this Agreement.

(iii)    Company Re-Establishment Right: Artist's election to so terminate this Agreement shall be of no force or effect if, within five (5) days after Company's actual receipt of such written notice from Artist, Company shall re-establish the operation of this Agreement.

9.    ARTIST INCAPACITY:

(a)    Effect of Artist's Incapacity: If by reason of mental or physical disability, Artist shall be incapacitated from performing or complying with any of the terms or conditions hereof ("Artist Incapacity") for a consecutive period in excess of ten (10) days (two (2) days if during principal photography) or an aggregate period in excess of fourteen (14) days (five (5) days if during principal photography) during the Term of this Agreement, then Company shall have the right to terminate this Agreement upon written notice to Artist.

(b)    Right of Examination: If any claim of mental or physical disability is made by Artist or on Artist's behalf, Company shall have the right to have Artist examined by such physicians as Company may designate, and Artist shall have the right to have Artist's personal physician present during any such examination.

10.    ARTIST DEFAULT: If Artist fails or refuses to perform or comply with any of the material terms or conditions hereof other than by reason of Artist Incapacity ("Artist Default"), then Company shall have

11

the right to terminate this Agreement upon written notice to Artist after providing Artist 72 hours (24 hours if during principal photography) to cure such Artist Default.

11.     EFFECT OF TERMINATION:  Termination of this Agreement as a result of the exercise of a right of termination pursuant to Paragraphs 8, 9, or 10 hereof shall have the following result:

        (a)     Company's obligation to pay Artist any further compensation shall be terminated. Nevertheless, if the termination is not for Artist Default, Company shall pay Artist any Guaranteed Compensation due and unpaid prior to the termination.

        (b)     Company shall not be deemed to have waived any other rights it may have or alter Company's right or any of Artist's agreements or warranties in connection with the rendition of Artist's services prior to termination.

        (c)     Company's obligations regarding Artist's credit, indemnification and insurance obligations shall survive termination of the Agreement.

12.     COMPANY RIGHT TO SUSPEND:  In the event of Artist Incapacity or Artist Default, Company may suspend the operation of this Agreement with respect to the rendition of services by Artist and the running of time hereunder so long as any such failure, refusal or inability on Artist Incapacity or Artist Default shall continue; and no compensation shall accrue or become payable to Artist during the period of such suspension.

        (a)     Artist Default Period:  Any Artist Incapacity or Artist Default shall be deemed to continue until Company's receipt of written notice from Artist specifying that Artist is ready, willing and able to perform the services required hereunder; provided that any such notice from Artist to Company (or Artist's reporting ready, willing and able to perform services) shall not preclude Company from exercising any rights or remedies Company may have hereunder or at law or in equity by reason of Artist Incapacity or Artist Default.

        (b)     Alternate Services Restricted:  During any period of suspension hereunder, Artist shall not render services for any party other than Company; provided, however, that during Company Disability Artist shall have the right to render services for herself or a third party, subject to Artist's recall on seventy-two (72) hours notice and provided that such services do not in any way whatsoever interfere with Artist's obligations hereunder.

        (c)     Company Right to Extend:  If Company elects to suspend the operation of this Agreement as herein specified, then Company shall have the right (exercisable at any time) to extend the Term hereof for a period equal to the period of such suspension.

        (d)     Additional Services:  If Company shall have paid compensation to Artist during any period of Artist Incapacity or Artist Default, then Company shall have the right (exercisable at any time) to require Artist to render services hereunder without compensation for a period equal to the period for which Company shall have paid compensation to Artist during such Artist Incapacity or Artist Default.

        (e)     Continuation of Suspension Period:  Notwithstanding anything to the contrary contained in this Agreement, any suspension of Artist's services hereunder by Company due to Artist Incapacity or Artist Default may continue, at Company's election, for a period of one (1) week following the date of receipt by Company of notice from Artist that Artist is ready, willing and able to perform the services required hereunder.

13.     EMPLOYMENT OF OTHERS:  Except as otherwise expressly set forth herein, Artist agrees not to employ any person to serve in any capacity, not to contract for the purchase or renting of any article or material and not to make any agreement committing Company to pay any sum of money for any reason whatsoever in connection with the Picture or services to be rendered by Artist hereunder or otherwise, without the prior written consent of Company.

12

14.    ASSIGNMENT AND LENDING:

(a)    Assignability:  This Agreement is non-assignable by Artist and Lender, other than Artist's and Lender's right to receive money.  This Agreement shall inure to the benefit of Company, its successors, assignees, licensees and grantees and associated, affiliated and subsidiary companies and Company and any subsequent assignee may freely assign this Agreement, in whole or in part, to any party provided that such party agrees in writing to keep and perform all of the executory obligations of Company hereunder.  Unless such assignment is to a major or mini-major entertainment company, Company shall remain secondarily liable hereunder.

(b)    Right to Lend to Others:  Company shall have the right to lend Artist's services hereunder to any of its subsidiary or affiliated companies.  No such lending of Artist's services shall relieve Company of its obligation hereunder.

15.    INDEMNITY:

(a) Artist shall indemnify and hold Company, its licensees and assigns, and the directors, officers, employees and agents of the foregoing, harmless from all third party claims, liabilities, damages, costs and reasonable outside legal fees (excluding regularly employed in-house legal counsel) arising from any breach by Artist of any warranty or agreement made hereunder.  Company shall have the right to assume the defense of any such claim or liability and Artist shall have the right to have Artist's own counsel present in connection herewith.  Artist shall have the right as well as the obligation to consult with Company upon Company's request with respect to all issues in connection with the claims, including without limitation, any proposed settlement thereof, it being specifically understood and agreed that Company's decisions in all such matters shall be final and shall not abrogate or diminish Artist's obligation to indemnify Company as set forth in this paragraph.  Notwithstanding the foregoing, Company agrees not to settle any such claim for money damages over Artist's objection provided that Artist posts a bond in the full amount of the claim, plus such additional amount as Company shall deem reasonably necessary to cover attorney's fees and costs.

(b)  Company shall defend, indemnify and hold Artist harmless from all third party claims, liabilities, damages, costs and reasonable outside legal fees (excluding regularly employed in-house legal counsel) (together, "Damages") arising from any breach by Company of any warranty or agreement made by Company hereunder from any use of the rights granted and/or materials supplied and/or services rendered by Company hereunder or from the production, distribution, exhibition, advertising, promotion and other exploitation of the Picture or any element thereof, except to the extent such Damages as covered by Artist's indemnification of Company hereinabove or caused by Employer's negligence or misconduct.

16.    REMEDIES:

(a).    Against Artist:  Artist's services and the rights herein granted are unique in character and value such that the loss thereof could not be reasonably compensable in damages in an action at law.  Accordingly, if Artist breaches this Agreement, Company shall be entitled to seek any available equitable relief, including but not limited to  injunctive relief.

(b).    Against Company:    The sole right of Artist as to any breach hereunder by Company shall be the recovery of money damages, if any, and the rights herein granted by Artist shall not terminate by reason of such breach.  In no event may Artist terminate this Agreement or obtain injunctive or other equitable relief with respect to any breach of Company's obligations hereunder.

17.    COMPANY'S CONTROL:  Artist acknowledges the right of Company to make or authorize any third party to make changes in the product of any of Artist's services hereunder in the preparation and exploitation of the Picture or the exercise of any of Company's rights hereunder, and in this connection Artist acknowledges and agrees that he shall not have any right of approval with respect to any such change with respect to any element of any production produced hereunder.  Without limiting the generality of the

13

foregoing sentence, Company shall have final artistic control over and the right to cut, edit, add to, arrange, rearrange, and revise the product of any of Artist's services hereunder in any manner. Artist, recognizing the needs of film production by granting the absolute and unlimited right to use the products of Artist's services hereunder for all purposes in any manner the Company may in its discretion think fit.

18.   MISCELLANEOUS:

   (a)   Illegality:  Nothing contained herein shall require the commission of any act or the payment of any compensation which is contrary to an express provision of law or contrary to the policy of express law; and if there shall exist any conflict between any provision contained  herein and any such law or policy, the latter shall prevail; and the provision or provisions herein affected shall be curtailed, limited or eliminated to the extent (but only to the extent) necessary to remove such conflict; and as so modified this Agreement shall continue in full force and effect.

   (b)   Remedies Cumulative:  All remedies accorded herein or otherwise available to either Company or Artist shall be cumulative, and no one such remedy shall be exclusive of any other.  Without waiving any of its rights or remedies under this Agreement or otherwise, Company may, from time to time, recover, by action, any damages arising out of any breach of this Agreement by Artist and may institute and maintain subsequent actions for additional damages which may arise from the same or other breaches.

   (c)   Captions:  Paragraph captions used in this Agreement are inserted only for the purpose of reference and shall not have any legal force or effect.  Such captions shall not be deemed to govern, limit, modify, or in any other manner, affect the scope, meaning or intent of this Agreement or any part thereof.

   (d)   Immigration:   All of Company's obligations are expressly conditioned upon Artist obtaining all necessary visas and permissions and complying with all laws and regulations necessary to allow Artist to perform Artist's services in the United States, including, but not limited to Artist's timely completion, to Company's reasonable satisfaction, of the I-9 Form (Employee Eligibilit Verification From).

   (e) Governing Law: This Agreement shall be construed in accordance with the internal law of the State of New York applicable to agreements which are executed and fully performed therein without giving effect to New York's principles of conflicts of law.

   (f) Amendments:  This Agreement may be amended or modified only by the written agreement of Artist and Company.

   (g) Entire Agreement:  These Standard Terms and Conditions, together with the performer Agreement attached hereto and hereby incorporated herein in their entirety, shall replace and supersede all previous arrangements, understandings, representations or agreements (written or oral, express or implied) between Company and Artist with respect to the subject matter hereof and expresses the entire agreement between Company and Artist with reference to the terms and conditions of Artist's Services for Company in connection with the Picture.

14

# EXHIBIT "B"

# ASSIGNMENT AGREEMENT

This Assignment Agreement (the "Assignment") is made and entered into as of this 4th day of ~~May~~ June, 2008, by and between PLEDGE THIS HOLDINGS, LLC ("Assignor"), a Delaware limited liability company, and MICHAEL I. GOLDBERG, in his capacity as court-appointed Receiver for Worldwide Entertainment Group, Inc. ("Worldwide"), The Entertainment Group Fund, Inc. and other affiliated entities ("Receiver").

WHEREAS, on or about June 3, 2004, Assignor entered into an agreement with Paris Hilton Entertainment, Inc. ("PHE") and Paris Hilton ("Hilton") (the "Production Agreement") for the production and distribution of a certain motion picture titled "NATIONAL LAMPOON'S PLEDGE THIS" (the "Movie"), a copy of which Production Agreement is attached hereto as Exhibit "A"; and

WHEREAS, on or about September 23, 2004, Assignor and Worldwide South Beach, LLC ("WWSB") entered into an Executive Producer and Financing Agreement and several subsequent amendments thereto (collectively, the "Financing Agreements"), pursuant to which WWSB provided financing to Assignor for the production of the Movie and, in consideration, received rights to portions of the adjusted gross proceeds from the sale and the distribution of the Movie, all as more fully set forth in the Financing Agreements; and

WHEREAS, Assignor is in possession of proceeds from the sale and distribution of the Movie which are due to be distributed to WWSB pursuant to the Financing Agreement (the "Current Distributable Funds");

WHEREAS, WWSB is and was at all time material hereto a wholly-owned subsidiary of Worldwide; and

{FT486162;1}

WHEREAS, by Court Order dated April 20, 2006, in the action pending in the United States District Court of Southern District of Florida styled: <u>Securities and Exchange Commission v. John P. Utsick, et al.</u>, Case No. 06-20975-CIV-HUCK (the "Action"), the Receiver was appointed as receiver for Worldwide and several other related entities and authorized and directed to marshal assets for the benefit of the creditors of the receivership estate; and

WHEREAS, Ckrush, Inc., formerly known as CEDRIC KUSHNER PROMOTIONS, INC. ("Ckrush") and James DiLorenzo ("DiLorenzo") are currently the managers of Assignor and warrant and represent that they are authorized to enter into this Assignment on behalf of Assignor and to bind Assignor and its members to the terms hereof; and

WHEREAS, Assignor now desires to assign certain rights under the Production Agreement to the Receiver so that the Receiver may pursue claims thereunder for the benefit of both Assignor and the creditors of the receivership estate in the Action;

NOW, THEREFORE, in consideration of the premises, the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

<u>**AGREEMENT**</u>

1.    <u>ASSIGNMENT</u>. Assignor hereby assigns to the Receiver all of Assignor's right, title and interest in and to any claims or causes of action that Assignor may have against PHE, Hilton or any other party that arise out of, under or in connection with the Production Agreement. To the extent that the Receiver pursues any such claims or causes of action (the "Hilton Suit"), it shall do so at its expense and will make no claims for such expenses against Assignor, its members, Ckrush or DiLorenzo. In the event PHE or Hilton files a counter claim or third party claim against Assignor, its members, Ckrush and/or DiLorenzo based on the facts or

circumstances alleged in the Hilton Suit,, the Receiver agrees to retain counsel of his choice to defend Assignor, its members, Ckrush and/or DiLorenzo in such counter claim or third party claim and bear all attorneys fees and costs associated with such defense. In all private and public communications concerning any claims, the Receiver will indicate to third parties that the claims are brought solely by the Receiver and not for, on behalf of, or at the request or suggestion of Assignor, its members, Ckrush or DiLorenzo.

2.     PROCEEDS OF LITIGATION.    In the event that the Receiver pursues claims arising out of, under or in connection with the Production Agreement, the parties agree that any and all amounts actually recovered by the Receiver, whether by settlement or collection of judgment, shall be distributed in the following order: (1) to first reimburse the Receiver for all attorney's fees and expenses incurred in the investigation and litigation of such claims; (2) to next reimburse the Receiver $84,737.00 of the Current Distributable Funds otherwise currently payable to the Receiver that the Receiver has permitted Assignor to use in order to satisfy Assignor's obligation to creditors in Section 3 below; and (3) thereafter, 90% to the Receiver and 10% to the Assignor.

3.     RETENTION OF DISTRIBUTABLE FUNDS.    The Receiver agrees that Assignor may retain $84,737.00 out of the Current Distributable Funds that would otherwise be due and payable to the Receiver in order to satisfy Assignor's obligations to creditors.

4.     NO RELEASE. Nothing contained herein shall be construed as releasing or limiting in any way Assignor's liabilities, duties or obligations, if any, under the Production Agreement and in no event shall Assignor be relieved of any its obligations under the Production Agreement as a result of this Assignment.

{FT486162;1}

5.   REPRESENTATION AND WARRANTIES.  Assignor represents and warrants that: (i) it is duly organized and validly existing and in good standing by the laws of the place of its organization and has the requisite power and authority to execute and deliver this Assignment; (ii) the Production Agreement is valid and enforceable; (iii) Assignor has not defaulted on any of its obligations under the Production Agreement and no condition exists that, upon the passage of time, will become a default; (iv) the Production Agreement has not been terminated, modified, or amended, except as expressly referenced herein; (v) the Production Agreement has not been previously assigned or any interest in the Production Agreement pledged to any other party; (vi) the execution, delivery and performance of this Assignment have been duly authorized by all necessary corporate action on Assignor's part, and the parties executing this Assignment on behalf of the Assignor has full authority to execute this Assignment on behalf of the Assignor.

6.   GOVERNING LAW AND JURISDICTION.  This Assignment shall be interpreted under the laws of the State of Florida. The parties agree that in the event of any litigation arising out, under or in connection with this Assignment, the Court in the Action shall be the exclusive forum for the resolution of such disputes. Assignor, and the parties executing this Assignment on behalf of Assignor, agree that they shall be subject to the personal jurisdiction of the Court in the Action in the event of such litigation. This is Agreement is subject to approval by the Court.

7.   RECITALS.  Recitals to this Assignment are hereby incorporated in this Assignment by reference.

8.   AMENDMENT. This Assignment will not be changed or amended except by a writing duly authorized and executed by the party against who enforcement is sought and consented to in writing by the parties.

9.  **FURTHER ASSURANCES.**  Promptly upon request from time to time of the other party, each party shall duly execute, acknowledge and deliver, or cause to be done, executed, acknowledged or delivered, to or at the direction of such party, all further acts, transfers, assignments, powers and other documents, instruments as may be so requested to get effect to the transactions contemplated hereby.

10.  **COUNTERPARTS; FACSIMILES.**  This Assignment may be executed in any number of counterparts and delivered via facsimile each of which when executed and delivered shall be deemed an original but all of which together shall constitute one and the same instrument.

PLEDGE THIS HOLDINGS, LLC

By: James DiLorenzo
Its: Manager

MICHAEL I. GOLDBERG,
solely in his capacity as Receiver

{FT486162;1}

# EXHIBIT "C"

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## (MIAMI DIVISION)

### CASE NO. 06-20975-CIV-HUCK / SIMONTON

SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff,

v.

JACK P. UTSICK, ROBERT YEAGER,
DONNA YEAGER, WORLDWIDE
ENTERTAINMENT, INC.,
THE ENTERTAINMENT GROUP FUND, INC.,
AMERICAN ENTERPRISES, INC.,
AND ENTERTAINMENT FUNDS, INC.

    Defendants.

_____/

## ORDER GRANTING RECEIVER'S MOTION
## TO SETTLE CLAIMS AGAINST PLEDGE THIS HOLDINGS, LLC
## AND FOR AUTHORIZATION TO ENTER INTO ASSIGNMENT
## AGREEMENT WITH PLEDGE THIS HOLDINGS, LLC ASSIGNING
## <u>CAUSES OF ACTION AGAINST PARIS HILTON TO RECEIVER</u>

**THIS CAUSE** came before the Court without hearing upon the Receiver's motion

seeking an Order authorizing him to settle claims against Pledge This Holdings, LLC and for

authorization to enter into an Assignment Agreement with Pledge This Holdings, LLC assigning

causes of action against Paris Hilton, individually and Paris Hilton Entertainment to the Receiver

(the "Settlement Motion"). The Court, having reviewed the Settlement Motion, being advised

that counsel for the Securities & Exchange Commission has no opposition to the entry of an

Order granting the Settlement Motion, that counsel for Jack Utsick and Robert and Donna

{FT491410;1}

CASE NO. 06-20975-CIV-HUCK / SIMONTON

Yeager have taken no position on the Settlement Motion, and being otherwise fully advised in the premises, it is hereby:

**ORDERED AND ADJUDGED** that

1.     The Settlement Motion is GRANTED.

2.     The Assignment Agreement (a copy of which is attached to the Settlement Motion), is incorporated herein, ratified, approved and adopted by this Court. The Receiver is authorized to enter into the Assignment Agreement, execute any documents and take any actions reasonably necessary to consummate the transactions contemplated therein.

3.     The Court reserves jurisdiction to enforce the terms of the Assignment Agreement.

**DONE AND ORDERED** in Miami-Dade County, Florida on this 4th day of June, 2008.

PAUL C. HUCK
**UNITED STATES DISTRICT JUDGE**

**Conformed copies to:**

All counsel of record

{FT491410;1}

2

# 08-22261-CIV-MARTINEZ/BROWN

## CIVIL COVER SHEET

FILED by _IG_ D.C.
ELECTRONIC

AUG. 12, 2008

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

JS 44 (Rev. 2/08)

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as ~~required~~ by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.

## I. (a) PLAINTIFFS

MICHAEL I. GOLDBERG, et al.,

**(b)** County of Residence of First Listed Plaintiff **Broward County, FL**
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Thomas G. Schultz, Esq. - Tew Cardenas LLP
1441 Brickell Avenue, 15th Floor
Miami, FL 33131 - (305) 536-1112

## DEFENDANTS

PARIS HILTON ENTERTAINMENT, INC., a California corporation, and PARIS HILTON, an individual

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys (If Known)

**(d)** Check County Where Action Arose: ☑ MIAMI- DADE ☐ MONROE ☐ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☑ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

Date 08CV22261 - Martinez/Brown

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☒ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☑ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed- (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).
(See instructions second page):

a) Re-filed Case ☐ YES ☑ NO
b) Related Cases ☑ YES ☐ NO

JUDGE PAUL C. HUCK          DOCKET NUMBER 06-20975-Civ-Huck

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):

BREACH OF CONTRACT

LENGTH OF TRIAL via _3_ days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☑ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD
s/ _Thomas G. Schultz_

DATE 8-12-08

FOR OFFICE USE ONLY
AMOUNT 350   RECEIPT # 985275   IFP