UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  08-22261-CIV-MORENO

MICHAEL I. GOLDBERG, in his capacity
as court-appointed Receiver for Worldwide
Entertainment Group, Inc., a Delaware
corporation, The Entertainment Group Fund,
Inc., a Florida corporation, and other affiliated
entities,

                    Plaintiff,

vs.

PARIS HILTON ENTERTAINMENT, INC., a
California corporation, and PARIS HILTON, an
individual,

                    Defendants.

_____/

## PLAINTIFF'S BRIEF ON RESTITUTION DAMAGES

Plaintiff, Michael I. Goldberg, in his capacity as court-appointed receiver for Worldwide Entertainment Group, Inc., The Entertainment Group Fund, Inc., and other affiliated entities, pursuant to the Court's Order dated August 17, 2009 (D.E. 139) (the "Order"), hereby files this brief on restitution damages and states as follows:[1]

### Introduction

**I.    Plaintiff Is Entitled to Damages for Ms. Hilton's Failure to Perform DVD and International Promotion.**

Defendants have taken the preposterous position in this case that, even if a breach of contract were proven in this case, Plaintiff cannot recover any damages because any possible theory of damages would be speculative. Plaintiff agrees that an award of expectation damages (lost profits) would have been speculative and acknowledges that this Court has ruled that reliance damages are speculative. At a minimum, however, Plaintiff is entitled to restitution damages. Otherwise, Defendants' position is that they could have breached Ms. Hilton's

---

[1]  Plaintiff uses herein the following defined terms: the "Picture" is National Lampoon's Pledge This!; the "Agreement" is the Deal Memorandum between Defendants and Pledge This, LLC.

contract with impunity since, under their theory, there is no remedy for damages for breach. That is, under Defendants' over-reaching theory, Defendants could stipulate that they committed a material breach as to all nine publicity requests at issue in this case, but Plaintiff would not be entitled to seek damages for such breaches.

Clearly, under a restitution analysis, it is unjust for Ms. Hilton to receive a $1,000,000 fee which entailed an obligation to perform certain services and fail to perform all of the services for which she was paid, without Ms. Hilton disgorging at least a portion of that fee. In this case, the Agreement specifically entailed that Ms. Hilton would "perform reasonable promotion and publicity services." (Agreement, § 10.b.i.) If it is determined that she breached the contract, Plaintiff is at least entitled to damages based on the value of the services that were not performed in breach of the contract.

Despite the fact that the Agreement specifically contemplates that Ms. Hilton will "perform reasonable promotion and publicity services" for the Picture (Agreement, §10.b.i.), Defendants argue that Ms. Hilton was not required to do DVD or foreign promotion because the Agreement does not mention DVD or foreign releases in the promotion clause of the Agreement. Contrary to Defendants' strained position, the Agreement does not distinguish between promoting the theatrical release or the DVD release, and it expressly contemplates a DVD release and foreign releases. (See Agreement, §§ 3.c., 3.f., and 9.b.) Defendants were always aware of the fact that DVDs were contemplated in the Agreement. (See Moore Dep. at 198-99 and Plaintiff's Exhibit 94 (Mr. Moore stating that it was "always going straight to video").) It is clear that Ms. Hilton was paid to promote the DVD of the Picture and to promote the Picture internationally.

## II.    The Damages Analysis

On December 19, 2008, Plaintiff provided Defendants with the report of Plaintiff's damages expert, David Nolte. (See Exhibit A hereto.)[2] In that report, Mr. Nolte presented two damages models, one for reliance damages and one entailing a valuation of Ms. Hilton's promotional services based on a "fair market value" of such promotional services. In his recitation of the alternative damages model in that report, Mr. Nolte noted that, based on information that had been reported in the press, Ms. Hilton had been paid between $140,000 to

---

[2]    Plaintiff retained Mr. Nolte because he is extremely well-regarded as a damages expert involving the entertainment industry and celebrities.

$1,000,000 to make publicity appearances. (See Exhibit A at 6-7.) However, Mr. Nolte concluded that he "would prefer to analyze Ms. Hilton's actual contracts and other materials, to the extent such becomes available in this matter, in order to value of her [sic] promotional efforts." (Exhibit A at 7.)[3]

On January 30, 2009, Defendants made a small supplemental document production, which included some of Ms. Hilton's contracts that entailed promotional engagements.[4] Mr. Nolte reviewed those documents and began the process of supplementing his analysis of compensation that Ms. Hilton had received for promotional appearances. The interim draft was provided to Defendants, and Defendants' counsel used it as an exhibit at Mr. Nolte's February 12, 2009, deposition. (See Exhibit D.)[5] At Mr. Nolte's deposition, Defendants' counsel confirmed that Mr. Nolte's "analysis [is] trying to determine what portion of the million dollars is attributable to her publicity services" and asked Mr. Nolte about that analysis. (Exhibit E (Nolte Dep. at 226).)

Thereafter, on February 13, 2009, Defendants provided a voluminous production of documents which included additional contracts, and, on March 12, 2009, Defendants provided an interrogatory answer which was compelled by an order from Magistrate Judge O'Sullivan which listed Ms. Hilton's revenues from promotional engagements in 2006 and 2007 (including payments made for promotions that were apparently done pursuant to oral agreements and therefore not contained in the previous document productions).

Mr. Nolte analyzed the additional contracts and interrogatory answers and prepared a thorough analysis of all of the information produced by Defendants. This resulted in his supplemental report, which was produced on April 10, 2009. (A copy of the supplemental report is attached hereto as Exhibit F.)

Mr. Nolte's supplemental report details his final calculations based on the information produced by Defendants. In short, Mr. Nolte analyzed Ms. Hilton's promotional engagements

---

[3]  Plaintiff incorporated Mr. Nolte's report by reference in response to Defendants' damages interrogatories. (See Exhibit B hereto.)

[4]  On November 13, 2008, Plaintiff served Defendants with a document request seeking such information (e.g., documents reflecting the monetary value of Ms. Hilton endorsing or promoting any product or business venture). (See Exhibit C.)

[5]  As Defendants claim that the information used to prepare the draft is confidential, Plaintiff has redacted identifying information contained in the document. In any event, the Court has unsealed Mr. Nolte's final supplement. (See D.E. 135.)

and synthesized that information to determine what she gets paid by others to make a promotional appearance; he took the nine publicity requests that are at issue in this case and compared them to the types of publicity services that Ms. Hilton has provided and/or for which she has been contracted and/or paid. In doing so, he divided promotional tasks into three categories, two of which could be used to apply in this case: (1) engagements for Ms. Hilton's presence at a specific location, including any scripted or non-meaningful speaking (Category 1); and (2) a promotional event where some type of unscripted speaking in an interview setting is required (Category 2). Specifically, Mr. Nolte determined that Ms. Hilton gets paid, on average, $80,000 for a Category 1 engagement ($30,000 if a median is used as opposed to an average) and $120,000 for a Category 2 engagement ($80,000 if a median is used). (See Exhibit F.)

Mr. Nolte concluded that the total value of the nine publicity requests at issue ranges between $600,000 and $1.6 million (using rounded numbers), depending on the number of events that she could attend and whether an average or median were used. (See Exhibit F.) Mr. Nolte's overall conclusion was that "practically all of the moneys Ms. Hilton was paid for Pledge This! pertain to her promotional activities." (See id.) Nevertheless, even if one were to look past Mr. Nolte's overall conclusion, Mr. Nolte provides the breakdown for his calculation. Each of the nine publicity requests at issue in this case has a fair market value, and, if the Court were to determine that only some (but not all) of the requests resulted in a breach, there is a framework for the Court to determine the value of those requests.[6]

In short, Ms. Hilton should not be able to receive a fee for services that she failed to provide.

---

[6] In the Order, the Court notes that, "[i]f the Receiver were to be successful on this restitution claim, the Court would need to decide how much of the $935,000 was for the use of her name and likeness in promoting the DVD immediately before and within a reasonable time after the DVD release on December 19, 2006 versus the promotion she performed leading up to the theatrical release of the movie." (Order at 7.) In terms of the promotional requests (if that is what the Court is referencing), all of them were made within a reasonable time, particularly taking into consideration that it is undisputed that there also was a rolling release of the Picture internationally which coincided with the requests. Indeed, Defendants have conceded that the time period at issue in this case was reasonable. (See 7/10/09 Trial Tr. at 152 ("Q. [MR. WEINSTEN] And had you been available during this period of time in this case, which is December 5, 2006 to two thousand--- I'm sorry--- May of 2007, would you have done some publicity? A. [MS. HILTON] Yes, of course. . . .").)

**Argument**

## I.   NEW YORK LAW ON RESTITUTION FOR BREACH OF CONTRACT FAVORS A RECOVERY IN THE PRESENT CASE.

Under a theory of restitution:

> It is well settled that if the plaintiff has made money payments to the defendant, and there is a failure of consideration whereby defendant materially breaches the contract, the plaintiff can maintain an action for restitution of the money so paid to the defendant, with interest.

In re Men's Sportswear, Inc., 834 F.2d 1134, 1141 (2nd Cir. 1987) (citing New York law); see also In re Asia Global Crossing, Ltd., 404 B.R. 335, 341 (S.D.N.Y. 2009) ("The general principle is that upon the defendant's substantial breach or repudiation of an enforceable contract, the plaintiff is entitled to recover restitution of any benefits he has conferred in performance of the contract, for example, any part of the price which he has prepaid, or the reasonable value of any services rendered as contract performance.") (quoting 3 Dobbs, The Law of Remedies, § 12.7(1) (2d ed. 1993)).   Ms. Hilton's breach of the publicity clause of the Agreement clearly constitutes a "material" or "substantial" breach of the Agreement.

Bausch & Lomb, Inc. v. Bressler, 977 F.2d 720 (2nd Cir. 1992)--- upon which this Court has relied in its Order--- aptly illustrates the application of restitution under New York law.[7]   In that case, the Second Circuit saw "no justification on this record for an award of the $500,000 as reliance damages" (much like this Court in the present case), but it noted that "[w]e believe, however, that [the plaintiff] may be entitled to a damage award by way of restitution."   Id. at 729.   The Second Circuit summarized New York law as follows:

> The doctrine of restitution is premised upon the equitable principle that a person who has been unjustly enriched at the expense of another is required to make restitution to the other.   Upon demonstration that a defendant is liable for material breach, the plaintiff may recover the reasonable value of services rendered, goods delivered, or property conveyed less the reasonable value of any counter-performance received by him.   Because the doctrine of restitution looks to the reasonable value of any benefit conferred upon the defendant by the plaintiff, and is not governed by the terms of the parties' agreement, restitution is available even if the plaintiff would have lost money on the contract if it had been fully performed.

---

[7]   Defendants agree that Bausch & Lomb sets forth the applicable framework for restitutionary damages for breach of contract in New York. (D.E. 85 at 6.)

Bausch & Lomb, 977 F.2d at 729-30 (citations and quotation marks omitted).

The Bausch & Lomb opinion is noteworthy for at least four reasons: (1) a restitution claim is not necessarily governed by the terms of the contract, including the contract's price; (2) where a breaching defendant has also partially performed the agreement, the restitutionary amount can be apportioned; (3) market rates can be used to determine the value of the benefit received by the defendant; and (4) the fact that a contract is a losing proposition does not affect the award.

First, the Bausch & Lomb court rejected the defendant's contention that any portion of the $500,000 payment was precluded by the parties' agreement, stating "[t]he terms of the Agreement do not control an award of restitution." Id. at 730. According to the Second Circuit, the plaintiff "would be entitled to recover as much of the $500,000 payment it made to [the defendant] as it can show unjustly enriched [the defendant]." Id. In this case, Defendants have argued that the amount of restitution must be specifically stated in the Agreement. That type of argument has been rejected.

Second, the Second Circuit noted that the amount of restitution would not be the full amount of the contract price, and therefore some apportionment would be required in that case. Id. Any benefits that were received by the plaintiff were required to be offset against the amount paid. Id. The Second Circuit noted:

> In order to determine how much of the $500,000 payment [the defendant] must pay to [the plaintiff] under a restitution theory, the district court must ascribe a value to the distribution right [the plaintiff] enjoyed for the years preceding the Agreement's termination and then use it as an offset to the $500,000. As set forth above, the reasonable value of the benefit unjustly received, not the contract price, determines the amount of an award in restitution. However, the contract may provide probative evidence of the value of the benefit. Indeed, in the absence of a readily available market price, the value that the parties ascribe to a benefit in their contract may be the best valuation measure available to the court.

Id. (citations omitted). In concluding its analysis, the Second Circuit "[d]irect[ed] the court on remand to grant a restitutionary award to [the plaintiff] consistent with this opinion." Id. In its remand, the Second Circuit noted that the district court could pro-rate the amount received by the defendant and also further take into consideration the diminished value of the benefit that the plaintiff may have received as a result of a breach by the defendant. Id. The foregoing

framework is analogous to this Court requesting that Plaintiff apportion the $1,000,000 paid to Ms. Hilton for the publicity at issue in this case. (See Order at 7.)

Third, as stated in Bausch & Lomb, "*__in the absence of a readily available market price__*, the value that the parties ascribe to a benefit in their contract may be the best valuation measure available to the court." Bausch & Lomb, 977 F.2d at 730 (emphasis added); see also Farash v. Sykes Datatronics, Inc., 59 N.Y.2d 500, 505 (1983) (in discussing law of restitution, noting that although market value exceeds cost to plaintiff, "there is no reason why recovery of this excess should not be allowed")(quoting 12 Williston, Contracts (3rd ed.), at 282-84, 286-87); United States v. Zara Contracting Co., 146 F.2d 606, 611 (2nd Cir. 1944) (noting that restitution claim based on value of services could be based on amount for which the services could be purchased at time that were services rendered).  In the present case, the parties did not ascribe a specific value to any particular task in the Agreement; rather, Ms. Hilton was paid $1,000,000 for a bundle of obligations.  Mr. Nolte's methodology is consistent with looking at a "readily available market price"--- i.e., the amount that Ms. Hilton got paid to make a particular type of promotion appearance in the arm's length transactions that she has with persons seeking her promotion services.

Fourth, "restitution is available even if the plaintiff would have lost money on the contract if it had been fully performed." Bausch & Lomb, 977 F.2d at 730.  Thus, the concerns that this Court may have had under a reliance damages model with respect to the Picture losing money even with Ms. Hilton's promotion are not present in a restitutionary damages model.

The general principles of New York law on restitution have been applied where a defendant contracted to perform certain services has only provided part of the services.  In G.D. Searle & Co. v. Medicore Communications, Inc., 843 F. Supp. 895, 907-08 (S.D.N.Y. 1994), the plaintiff pursued a restitution theory where a defendant was required to perform certain services at a symposium, including, *inter alia*, to pay third-party vendors.  The court held that the funds that the plaintiff gave to the defendant for the payments to the third parties, which the defendant never forwarded to the third parties, presented a valid claim for restitution as a matter of law.  Id. As for the component of recouping the $110,500 management fee paid to the defendant, the court held as follows:

> The task of remitting payment to these third parties was one of the services Medicore was under a duty to provide as Searle's agent. Presumably, this service was of some value, and it may therefore represent a certain portion of the

management fee charged by Medicore for its services in connection with the Norpace symposium. In view of the many services provided by Medicore over the course of the Norpace symposium, however, plaintiff is not entitled to damages in the amount of the entire management fee; nevertheless, that portion of the management fee that represents payment for the services Medicore was to have provided in remitting payment to (as of yet unpaid) third party vendors must be determined by the trier of fact.

Id. at 907-08. Again, the fact pattern in that case is similar to the present case in that Defendants here admit that Ms. Hilton was paid $1,000,000 but contend that, since the Agreement does not parse out and itemize the $1,000,000 for the various activities required under the Agreement, no recovery is possible. Nevertheless, in G.D. Searle, the court held that it is for the trier of fact to apportion the fee where the defendant was paid a flat fee for a bundle of services, and the defendant performed some, but not all, of the services. Id. at 908; see also In re Men's Sportswear, Inc., 834 F.2d at 1141 (holding that plaintiff was entitled to portion of royalty payment that should have been set aside for advertising expenses).

## II.   MS. HILTON WAS PAID TO PROMOTE THE PICTURE.

Defendants do not disagree with the general methodology for seeking restitutionary damages. Indeed, at the July 10, 2009, trial proceeding, Defendants' counsel conceded such in describing what he characterized as a "smarter more provable type of damages":

> MR. WEINSTEN: . . . Take the million dollars. Figure out, Okay, of a million dollars--- get an expert on the stand. Well, 50 percent of that's for her name and likeness; 40 percent's for her acting services, and 10 percent is for publicity. Of that 10 percent for publicity, she went to Cannes, so let's knock out 5 percent 'cause that's the biggest thing. She did the premiere. . . . So now we're down to 1 percent or whatever. That's how it should have been approached.

(7/10/09 Trial Tr. at 122.) While Plaintiff disagrees with the numbers used by Defendants' counsel (as they were obviously randomly pulled out of thin air and would result in a damages award of $10,000), it is evident that Defendants acknowledge the basic methodology for determining the portion of the $1,000,000 that is attributable to the promotion at issue in this case.

The basic premise of Plaintiff's argument is very simple, albeit a significant amount of number-crunching and analysis was required. It is undisputed that Ms. Hilton was paid $1,000,000 under the Agreement. The contract provides that Ms. Hilton was to be paid $1,000,000 "[a]s full and complete consideration for the ***services rendered and to be rendered***

*to Company concerning the Picture. . . ."* (Agreement, § 2.a.) Under the contract, Ms. Hilton was required to "perform reasonable promotion and publicity *services*." (Agreement, § 10.b.i.) Thus, reasonable promotion and publicity "services" are something for which Ms. Hilton was paid. Pledge This, LLC did not receive the services for which it paid and therefore is entitled to compensation. Conversely, Defendants take the extreme position that Ms. Hilton was paid absolutely nothing to promote the Picture.

The basic premise for Defendants' argument is that the August 23, 2004, amendment to the Agreement (Plaintiff's Exhibit 2 (the "August 2004 Amendment")) provided that "the parties agree that the fee called for thereunder shall be allocated, $65,000 for acting services and $935,000 for executive producer services." (See D.E. 85 at 7.) Defendants' strained argument therefore goes that, since there is no separate fee listed for "promotion" in the August 2004 Amendment, Ms. Hilton was not paid *anything* to promote the Picture.[8] This amendment, however, helps Plaintiff in his restitution argument, and it tremendously hurts Defendants' argument.

The August 2004 Amendment confirms that Ms. Hilton was being paid the $1,000,000 for her "services." Nevertheless, according to Defendants, Mr. Shapiro (Ms. Hilton's attorney) opined that actors are paid "for (i) the actor's performing services and (ii) the right to use the actor's name, voice and image in TV commercials, on billboards, posters, bus-stops, etc." (D.E. 85 at 8; see also Defendants' argument at D.E. 136 at 15 ("The undisputed evidence remains that the $1,000,000 paid to Ms. Hilton was for acting services and name and likeness rights. Nothing was paid for publicity, so there is nothing to be paid back.").) Despite the fact that Defendants are relying on the August 2004 Amendment, Defendants are inconsistently arguing that Ms. Hilton was paid $1,000,000 for undescribed "services" *and* for use of her "name, voice and image" but that nothing is attributable to any promotion services. However (and importantly), Defendants gut their own argument because the August 2004 Amendment does not pay Ms. Hilton *anything* to use her name and likeness. Based on Defendants' reliance on the August

---

[8]   This position stands in stark contrast to Defendants' acknowledgment that Ms. Hilton continued to have promotion obligations after the signing of the August 2004 Amendment. Indeed, Defendants have conceded that Ms. Hilton continued to have promotion obligations after the October 2006 premiere of the Picture. (See 7/9/09 Trial Tr. at 96 ("MR. WEINSTEN: Okay. I'm not going to come here and try to pretend that it stops as of the day of the premiere. I'm not going to say that. It would be stupid for me to say that.").)

2004 Amendment, the entire $1,000,000 was paid to her for her "services." Defendants cannot have their cake and eat it too.

Importantly, the fact that Ms. Hilton was paid $65,000 as an actress and $935,000 as an Executive Producer does not mean that those roles did not entail promotional duties in exchange for those fees. The August 2004 Amendment certainly did not abrogate Ms. Hilton's duties to promote the Picture.

In defining what Ms. Hilton's responsibilities were as an Executive Producer on the Picture, Mr. Moore (Ms. Hilton's manager) included, as one of her duties, that "[s]he obviously was promoting the film." (Moore Dep. at 154-55.) Ms. Hilton confirmed at trial that her role as Executive Producer included promoting the Picture. (See 7/10/09 Trial Tr. at 245 ("Q. And as an executive producer of the film, did you have an interest in trying to promote the film?  A. Yes.  And I did promote the film as much as possible.").)  Thus, at a minimum, Defendants acknowledge that at least part of the $935,000 for the Executive Producer fee was to promote the Picture.[9]  Moreover, there is nothing that says that Ms. Hilton did not have a duty to promote as an actress.

Accordingly, the underlying premise is that Ms. Hilton was paid to promote the Picture, and that obligation has a value.

## III.  MR. NOLTE'S METHODOLOGY COMPORTS WITH THIS FRAMEWORK.

Since the Agreement bundles all of the services together for Ms. Hilton's compensation, it was necessary to put a value on certain types of promotional appearances by Ms. Hilton. As Mr. Nolte explains, this can be done by isolating instances where Ms. Hilton was paid by others to make certain types of promotional appearances that are comparable to what Pledge This, LLC asked of Ms. Hilton. As noted above, market value can be looked at to determine an appropriate amount to award in restitution. See Bausch & Lomb, 977 F.2d at 730; Farash, 59 N.Y.2d at 505.

In putting a value on her services, the gist of the analysis is what Pledge This, LLC would have had to pay for the promotional services had it ordered them "*a la carte*" (in reality, it

---

[9]   The only other thing that Ms. Hilton testified that she did as an Executive Producer on the Picture was that she "helped find the cast." (7/10/09 Trial Tr. at 245.)  Under Defendants' far-fetched argument, if Ms. Hilton were not paid to promote as an Executive Producer, it would follow that she was paid the entire $935,000 to "help find the cast." In any event, Defendants do not contend that Ms. Hilton was paid anything to help with the cast (since they only claim that she was paid $1,000,000 for acting and for her name and likeness (D.E. 136 at 15)).

did not have to do that because it already paid Ms. Hilton for such services off of the "*prix fixe*" menu). Using Ms. Hilton's contracts and interrogatory answers, Mr. Nolte distilled the rates that Ms. Hilton charges for certain promotional tasks that require a particular amount of effort on her part.[10]   By way of example only (for instance, taking the publicity requests as to which Ms. Hilton did not respond within 72 hours), if the Court were to rule that Ms. Hilton should have attended at least two out of the three requested Los Angeles talk shows, the Russian FHM interview, the MTV/VH1 satellite radio interview, and the May 2007 Japan appearance, the value of those services would be $520,000 based on the rate that Ms. Hilton charges to attend comparable publicity events (using averages).   (See Exhibit F at 7.)[11]   The number could be higher or lower depending on the Court's determination as to which publicity requests involved a breach of contract by Ms. Hilton.

Defendants' point regarding the "smarter more provable type of damages" is that a deduction should be made for the promotional activities that Ms. Hilton did perform, citing to the 2005 Cannes Film Festival and the Chicago premiere.   (7/10/09 Trial Tr. at 122.)   Mr. Nolte's model easily accommodates that argument.   For example, assuming that the 2005 Cannes Film Festival were at the highest end of the spectrum, it would have a value of $120,000.[12]   That amount can be deducted from the $1,000,000.

Making a deduction for the Chicago premiere is a different issue, however.   There was separate consideration exchanged by the parties for Ms. Hilton's attendance at the October 26, 2006, premiere pursuant to a "side letter agreement." (See Plaintiff's Exhibit 3.)   As Mr. Shapiro testified, Ms. Hilton agreed to attend the premiere "in exchange for certain reps and warranties about the use of the new material that was shot for the film." (Exhibit G hereto (Shapiro Dep. at 36).)   Thus, there would not be a monetary value placed on the premiere from the $1,000,000 because the parties exchanged separate consideration to secure Ms. Hilton's attendance for that event.

---

[10]   Ms. Hilton's other acting contracts were not useful in this exercise as those contracts also include publicity obligations that were bundled with other services.   Moreover, Defendants refused to provide Plaintiff with the amounts that Ms. Hilton was paid for some of the other films and redacted the amount of her fees from the documents when they produced them.

[11]   Using medians, the number would be $300,000.

[12]   Ms. Hilton suggested that she would have been in Cannes at that time anyway.   (See 7/10/09 Trial Tr. at 243) ("I go to Cannes every single year.").)

The fact that the higher end of the range of Mr. Nolte's final conclusion, as a whole, exceeded the $1,000,000 amount that Ms. Hilton was paid does not affect the legitimacy of a restitution calculation.  See Farash, 59 N.Y.2d at 505; United States v. Western Casualty and Surety Co., 498 F.2d 335, 338 (9th Cir. 1974) ("The contract price, while evidence of reasonable value, is neither the final determinant of the value of performance nor does it limit recovery.").

Plaintiff therefore requests that Mr. Nolte be permitted to testify to explain the foregoing analysis.  This will enable the Court to place a value on the services that Ms. Hilton failed to provide.

## IV.   DEFENDANTS' ARGUMENTS THAT THE RESTITUTION THEORY AND SUPPLEMENTAL EXPERT REPORT SHOULD BE EXCLUDED AS BEING UNTIMELY AND INADMISSIBLE LACK MERIT.

Defendants complain that Plaintiff's restitution argument is untimely because neither Plaintiff nor Mr. Nolte specifically used the word "restitution" when, on December 19, 2008, Mr. Nolte disclosed his alternative damages model based on the value of Ms. Hilton's promotional services.  In so doing, Defendants desperately grasp for straws, particularly since they have always known that Plaintiff had an alternative damages theory involving recouping the money paid to Ms. Hilton based upon the value of the promotional services that she failed to provide.  As the New York Court of Appeals aptly stated in a discussion involving restitution, "[w]e should not be distracted by the manner in which a theory of recovery is titled."  Farash, 59 N.Y.2d at 506.  The fact that Mr. Nolte did not use the word "restitution" is much ado about nothing.

The fact of the matter is that Defendants have been aware that Plaintiff had an alternative damages theory based on recovering the value of Ms. Hilton's promotional services.  Mr. Nolte disclosed it in his December 19, 2008, expert report and even stated therein that "Fulcrum would prefer to analyze Ms. Hilton's actual contracts and other materials, to the extent such becomes available in this matter, in order to value of [sic] her promotional efforts."  (See Exhibit A at 7.)  After Defendants' January 30, 2009, production of eleven contracts (and/or pieces of contracts), Mr. Nolte provided Defendants' counsel with a draft "Supplemental Report" which Defendants' counsel marked as an exhibit at Mr. Nolte's February 12, 2009, deposition.  (Exhibit D.)  At the deposition, Defendants' counsel confirmed with Mr. Nolte that Mr. Nolte's "analysis [is] trying to determine what portion of the million dollars is attributable to her publicity services."

12

(Exhibit E (Nolte Dep. at 226).) On February 13, 2009, after Plaintiff sought and obtained relief from Magistrate Judge O'Sullivan, Defendants made a 761-page document production which contained more than 50 documents (including contracts, draft contracts, proposals, and other documents regarding promotional engagements); on March 12, 2009, Defendants provided court-ordered interrogatory answers containing the amounts that Ms. Hilton was paid for promotional engagements (including apparently based on oral agreements). On April 10, 2009, Plaintiff provided Defendants with Mr. Nolte's final calculations which took into consideration the information that Defendants subsequently provided.

The rules on supplementing expert reports are instructive on Defendants' allegations of untimeliness, as all that is at issue here is a supplementation of an expert report. The Federal Rules of Civil Procedure require that any additions or changes to the expert's report "must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due." Fed. R. Civ. P. 26(e)(2). Rule 26(a)(3), in turn, provides that "[u]nless the court orders otherwise, these disclosures must be made at least 30 days before trial." Fed. R. Civ. P. 26(a)(3)(B).[13] At this point, the damages phase of the trial has not even started, and Defendants even received Mr. Nolte's supplemental report three months before the trial on liability commenced on July 9, 2009.

The foregoing should be sufficient to dispel Defendants' argument that Mr. Nolte's supplement is untimely. Nonetheless, since Defendants' argument is based on re-hashing the course of this entire case, Plaintiff further explains below why Defendants' arguments are disingenuous.

A. **Defendants' Argument That Mr. Nolte's Supplement Was Untimely and That Defendants Were Completely Surprised by Plaintiff's Alternative Restitution Theory Lacks Candor.**

1. **Plaintiff Did Not Delay in Attempting to Obtain the Information.**

In order to deflect attention away from the fact that Mr. Nolte's supplement merely analyzes information that was obtained from Defendants in discovery, in their Reply on their Motion *in Limine*, Defendants suggest that Plaintiff orchestrated a strategy to delay that stretched back to November 2008. (See D.E. 98 at 4.) For example, Defendants contend that Plaintiff

---

[13]   In the present case, the parties' pretrial disclosures were not due until May (e.g., Plaintiff filed his witness and exhibit list on May 20, 2009 (D.E. 111)).

"unreasonably delayed in sending out discovery." (Id.) What Defendants fail to state is that the parties had their Rule 26 conference in late October 2008 and therefore were precluded from serving discovery prior to that time. See Fed. R. Civ. P. 26(d)(1). Indeed, Defendants had started the process of serving their initial discovery requests only ten days before Plaintiff did so. In short, serving initial written discovery requests shortly after the Rule 26 conference and five months before the discovery cut-off is not an "unreasonable delay." Similarly, Defendants allege that Plaintiff "unreasonably delayed bringing issues to the Magistrate." (D.E. 98 at 4.) Defendants omit pointing out that Defendants requested that Plaintiff refrain from contacting the Magistrate Judge because Defendants wanted to continue to "meet and confer" in order to avoid being brought before the Court. Moreover, Defendants' argument is belied by the fact that the Magistrate Judge repeatedly ***granted*** the relief sought by Plaintiff to compel discovery from Defendants.

Early in this case, on November 13, 2008, Plaintiff served his First Request for Production of Documents to Defendants. (See Exhibit C hereto.)[14] That request sought, *inter alia*, documents reflecting communications in which the monetary value of Ms. Hilton endorsing or promoting any product or business venture was discussed or in which there was reference as to whether Ms. Hilton's endorsement or promotion of a product would financially benefit the promotion of the product. (See Exhibit C (Requests Nos. 48-51).) Similarly, on November 21, 2008, Plaintiff served Defendants with interrogatories which sought information concerning contracts requiring Ms. Hilton to provide any promotion or publicity services and the revenues received as a result of Ms. Hilton's providing promotion and publicity services. (See Exhibit H hereto (Interrogatories Nos. 5-9).)

The purpose of these discovery requests was to determine that there is a value to Ms. Hilton's promotional services--- which is contrary to Defendants' assertion in this case that Ms. Hilton's commitments to engage in promotional efforts have absolutely no value. Defendants' argument that the publicity provision in the Agreement with Pledge This, LLC is worthless (despite such provision being included in a contract pursuant to which Ms. Hilton was paid

---

[14]   Defendants served their written response to that document request on December 12, 2008, but did not produce any documents at that time. Defendants did not produce their first document in the case until December 29, 2008. Unlike Defendants, Plaintiff began the process of producing documents simultaneously with his written response on December 3, 2008.

$1,000,000) is belied by Ms. Hilton's own people boasting that she is the consummate promoter and marketer.

While Defendants claim that "[a]t Plaintiff's request, Defendants agreed to extend the date for Plaintiff's expert report until December 19, 2008" (D.E. 98 at 2 n.1), it should be noted that, on November 26, 2008, Judge Huck issued an amended scheduling order, which made Plaintiff's expert report due on January 7, 2009. (See D.E. 26 at 3.) Defendants requested that Plaintiff's expert expedite his report, and Plaintiff agreed to provide the report by December 19, 2008— 19 days earlier than required if the parties had followed the timetable ordered by Judge Huck. (See D.E. 27 at 2.) Accordingly, this rebuts Defendants' inference that Plaintiff engaged in a nefarious scheme to create a delay in expert discovery. Plaintiff would have been within his rights to insist that he would abide by the schedule set by Judge Huck. As it turned out, Defendants did not provide any substantive discovery on December 12, 2008, as was expected, and therefore there was nothing to include in Mr. Nolte's December 19, 2008, report from Defendants' discovery responses (in any event, that information was not even provided by Defendants before the January 7, 2009, expert deadline set by Judge Huck).[15]

### 2.   Defendants Were Aware of This Alternative Damages Theory in December 2008.

Using the information that he had available at the time, as an alternative to analyzing Plaintiff's damages claim based on a reliance damages theory, Mr. Nolte included in his initial expert report consideration of the value of Ms. Hilton's promotional efforts had she performed any of the requested promotion that is at issue in the present case. In the introductory section of Mr. Nolte's December 19, 2008, report, he stated:

> Fulcrum has also been asked to analyze the fair market value of Paris Hilton's publicity and promotional services. Fulcrum understands that (i) additional information has been requested from Paris Hilton, such as information regarding payment for personal appearances and licensing of her name or image, and (ii) this additional information has not yet been produced.

---

[15]   Plaintiff agrees with Defendants that, had Defendants provided such discovery on December 12, 2008, Mr. Nolte would not have had sufficient time to completely analyze that information, but having that information seven days prior to issuing his initial report on December 19, 2008, would have been better than receiving nothing at all (and certainly better than waiting until February and March 2009 for further information).

15

(Exhibit A at 1.)  Mr. Nolte's report then had a second section entitled "Transactions in which Ms. Hilton's promotional efforts were compensated are an indication of the value of such services" which then explained that the value of Ms. Hilton's promotional services could be determined by examining similar transactions.   (Id. at 6-7.)  While in his report Mr. Nolte referred to information that was publicly available in the media, he concluded that he "would prefer to analyze Ms. Hilton's actual contracts and other materials, to the extent such becomes available in this matter, in order to value of [sic] her promotional efforts." (Id. at 7.)

In addition, in responding to Defendants' damages interrogatory, Plaintiff stated: "Computations regarding Plaintiff's damages claims are contained in the report of David Nolte served on December 19, 2008, which includes computations based on a reliance measure of damages.  In his report, Mr. Nolte also made reference to the value of Ms. Hilton's promotional services."  (Exhibit B.)  Thus, Defendants were repeatedly made aware that Plaintiff was pursuing an alternative damages model which was based on the value of Ms. Hilton's promotional services, even if the title "restitution" was not mentioned early on.

> **3.     The Information Related to the Restitution Theory Was the Subject of Discovery Proceedings Before the Magistrate Judge and Was Addressed in Mr. Nolte's Deposition, Evidencing That Defendants Were Aware of, and Understood, the Alternative Damages Theory.**

As explained in further detail below, Defendants resisted discovery on this issue, and Plaintiff was forced to seek relief from Magistrate Judge O'Sullivan.  It was not until March 12, 2009, that Defendants purported to finally comply with Magistrate Judge O'Sullivan's orders by serving an interrogatory response regarding moneys received as a result of Ms. Hilton's promotional activities--- information that Mr. Nolte needed to complete his analysis.  Defendants misleadingly have represented to this Court that the information in their March 12, 2009, interrogatory response was produced by February 13, 2009.  (See D.E. 98 at 4.)[16]

---

[16]   If the March 12, 2009, interrogatory answers were merely duplicative of what they produced on February 13, 2009, it is hard to comprehend why Defendants needed two weeks from the February 26, 2009, hearing with Magistrate Judge O'Sullivan to prepare the interrogatory answers.  The reason is that the final interrogatory answers were not duplicative of what was previously produced.  If Defendants' counsel required two weeks to draft the interrogatory answers (more than three months after the interrogatories were served), it was not unreasonable for Mr. Nolte to take four weeks to analyze all of the information and provide his final report.

Defendants are not being candid in commencing their Motion *in Limine* with the assertion that, "[o]n March 20, 2009, Plaintiff, in opposition to Defendants' Motion for Summary Judgment, suggested *for the very first time* that it might be adding a claim for 'restitution' damages." (D.E. 85 at 1 (emphasis in original).)  To the contrary, Defendants have been aware of this alternative measure of damages since the time that they received Mr. Nolte's original report in December 2008.  As noted above, Mr. Nolte clearly noted in his December 2008 report that the value of Ms. Hilton's promotional services was an alternative measure of damages.

After Defendants received Mr. Nolte's report and Plaintiff's interrogatory answers, Defendants devoted at least 33 pages of Mr. Nolte's February 12, 2009, deposition to this alternative measure of damages, wherein Mr. Nolte explained that one way to assess the value paid to Ms. Hilton for her publicity obligations for the Picture would be to compare such publicity to similar transactions in which Ms. Hilton was paid for her publicity services.  (See Exhibit E (Nolte Dep. at 199-229, 247-49).)  Towards the end of his questioning on this issue at Mr. Nolte's deposition, Defendants' counsel clearly understood the restitution aspect of Mr. Nolte's analysis.  For example, Defendants' counsel engaged in the following line of questioning (with his leading questions clearly evincing his understanding of the restitution theory):

> *Q.*      *We understand that she got paid a million dollars, correct?*
> *A.*      *Yes, sir.*
>
> Q.      And a portion of that is for her acting services, correct?
> A.      Correct.
>
> Q.      And a portion of that is for her use of name and likeness, correct?
> A.      Correct.
>
> Q.      And a portion of that is for her publicity services, correct?
> A.      Correct.
>
> *Q.*      *Is your analysis trying to determine what portion of the million dollars is attributable to her publicity services?*
> *A.*      *Correct.*

(Exhibit E (Nolte Dep. at 226) (emphasis added).)

Moreover, contrary to Defendants' assertion that they first learned of this damages theory on March 20, 2009 (i.e., when Plaintiff responded to Defendants' summary judgment motion),

this issue was discussed at the January 29, 2009, hearing before Magistrate Judge O'Sullivan. (See Exhibit I at 21.) As Plaintiff's counsel stated: "An alternative measure of damages that our expert has put in his report is to value how much her publicity efforts are worth, and that is one of the factors in these document requests." (Id.) Defendants' counsel acknowledged that "[t]here are two measures of damages Mr. West said that they are asserting in this case" and then proceeded to present Defendants' arguments on these issues. (Id.) Therefore, it is difficult to comprehend how Defendants believe that they can feign ignorance of this damages theory until March 20, 2009.

> **4.      Defendants' Contention That They Were Completely Unaware of an Alternative Damages Model Is Contradicted by the Fact That They Specifically Addressed the Damages Model in Their Experts' January 2009 Disclosures.**

Likewise, Defendants are not being forthright when they say that "[i]t is too late to retake Mr. Nolte's deposition, and too late for Defendants to consider retaining an expert." (D.E. 85 at 5.) First, Defendants opted not to produce their information prior to Mr. Nolte's deposition (nor did they ask to depose him a second time or even re-schedule the deposition, even though both Mr. Nolte and Defendants' counsel are located in Los Angeles), and Defendants' failure to comply with the first court order led Plaintiff to seek a second court order. Defendants have no one to blame other than themselves for that. Second, Defendants already disclosed an expert to rebut Mr. Nolte's alternative damages theory. Indeed, Mr. Shapiro covered the issue directly in his January 2009 expert report. Mr. Shapiro stated:

> Value of Promotional Services. The Receiver is attempting to draw a correlation between (i) the amount Ms. Hilton receives for non-film-related personal appearances and (ii) the value of her promotional services on a motion picture. This is really an "apples to oranges" comparison. There is a material distinction between the motivation of a corporate sponsor that hires Ms. Hilton to appear at a corporate event and the motivation of a film company that hires her to render performing services in a motion picture. A film requires weeks of prep/rehearsal work, months of production services and significant post-production work by an actor. The engagement also entails the above-referenced grant of rights which effectively drives worldwide sales/distribution of the project. A one-night appearance engagement is absolutely not analogous. Furthermore, in my experience as an attorney, I do not recall ever negotiating for an allocation of compensation between the artist's acting and promotional services. To the extent any such allocation exists (and, for tax purposes, allocations are occasionally negotiated), those allocations typically relate to the split of compensation between acting services compensation and name & likeliness compensation (as

referenced above).  For these reasons, I believe it would be very difficult to place an allocation on the value of film-related promotional services.

(See D.E. 51, Ex. 51 at 5.)  This further belies Defendants' feigned assertion that they did not know that Plaintiff had an alternative damages model based on the theory that Plaintiff was entitled to recoup the amount paid to Ms. Hilton based on the value of her promotional services. Indeed, in January, Mr. Shapiro specifically acknowledged that the damages model was based on "an allocation on the value of film-related promotional services." (Id.)[17]

Importantly, Defendants can hardly claim prejudice when it was ***Defendants' data*** on which Mr. Nolte relied for his calculations.  While Mr. Nolte was being deprived of this information, Defendants had the information at their disposal at all times.

**B.      Defendants' Disingenuously Omit in Their Motion *in Limine* That Plaintiff Twice Obtained Court Orders Compelling Defendants to Produce the Information That Was Eventually Used by Mr. Nolte to Make His Calculations.**

Defendants state the following in their Motion *in Limine*:

> On January 30, 2009, Defendants produced to Plaintiff Ms. Hilton's endorsement and personal appearance contracts for the time period between August 2006 and 2008 (the relevant time period of this case).  Although Defendants disputed the relevance of these documents, Defendants produced them *as a compromise* in an effort to resolve a discovery dispute over certain of Plaintiff's document requests. Weinsten Decl. ¶ 5.  On February 13, 2009, Defendants supplemented this document production to include endorsement and appearance contracts dating back to June 2004. Weinsten Decl. ¶ 6.

(D.E. 85 at 4 (emphasis added).)  Defendants then relegate to a footnote:

> Although Defendants initially objected to the request as irrelevant, on February 13, 2009, Defendants supplemented its response to Interrogatory No. 9 to reference the written contracts that were being produced as permitted by the Federal Rules of Civil Procedure. Weinsten Decl. ¶ 7.  On March 12, 2009, Defendants again supplemented this Interrogatory response, this time to specifically identify the contracts and monies paid under the contracts. Weinsten Decl. ¶ 7.

---

[17]  Mr. Shapiro states that "it would be very difficult to place an allocation on the value of film-related promotional services."  However, it should be noted that, under New York law concerning damages, "since it is a product of the defendant's wrongful conduct, he will not be heard to complain of the lack of precision."  Contemporary Mission, Inc. v. Famous Music Corp., 557 F.2d 918, 928 (2nd Cir. 1977).

(Id. at 4 n. 2.)  Noticeably absent in Defendants' discussion is the fact that Plaintiff needed to obtain ***two court orders*** compelling Defendants to provide that information.  (See D.E. 37; D.E. 49.)  Ostensibly, Defendants left these salient facts out because they squarely attribute ***to Defendants*** any delay in Mr. Nolte obtaining the data to include in his final calculation.

An uninformed reading of Defendants' argument would lead one to believe that Defendants provided the information in a cooperative fashion.  Defendants claim that they produced documents "as a compromise" on January 30, 2009, but they fail to note that there was a hearing on January 29, 2009, in which Magistrate Judge O'Sullivan made rulings regarding the information sought by Plaintiff and ordered the production of certain information.  (See D.E. 37.)

Curiously, despite the fact that Defendants were required by Magistrate Judge O'Sullivan to produce the information by February 12, 2009 (see D.E. 37 at 4), Defendants produced responsive documents on February 13, 2009 (i.e., one day late).  The significance of this is that Defendants took the deposition of Mr. Nolte on February 12, 2009, but they belatedly provided the information the day ***after*** his deposition.  In addition, Defendants served their court-ordered supplemental interrogatory answers five days late on February 17, 2009.[18]

Apparently, for strategic purposes, Defendants opted to produce the information late so that Mr. Nolte did not have it by the time of his deposition.  Indeed, Defendants' counsel was asking Mr. Nolte for his opinion by saying "Let's assume you were not to get any other additional data and this is all you had to rely on." (Exhibit E (Nolte Dep. at 213).)  Defendants' counsel used this tactic despite knowing well that Defendants had gathered documents to comply with Magistrate Judge O'Sullivan's Order.  Defendants' counsel, Mr. Weinstein, repeatedly asked questions based on that premise (i.e., Defendants' counsel repeatedly asked that Mr. Nolte give an opinion without seeing the court-ordered discovery that was due that day), and Mr. Nolte consistently responded that he needed to see the discovery.  (See Exhibit E (Nolte Dep. at 207 ("Well, I don't know what you are going to give me yet."), 211 ("I have not yet reached an opinion because I am waiting for records that I understand the Court has ordered to be produced

---

[18]   As explained herein, those interrogatory answers were deficient, and Plaintiff was forced to seek further relief from the Court.  Defendants claim that Plaintiff granted Defendants an extension to provide the court-ordered discovery.  However, Defendants presented the fact that they were not going to provide the discovery by the court-ordered deadline as a *fait accompli*.  For example, Defendants advised after Mr. Nolte's deposition that the court-ordered documents would not be made available that day.

and you've said earlier today you would be producing."), 213 ("You know, I haven't reached that conclusion, and at this point I know that there is more data coming. . . ."), 214-15 ("They require more care and thought, and since I know there are other transactions coming, I will devote the care and thought that it deserves when I get the information."), 215 ("I suspect what will happen is I'll issue a supplemental report that gives what I can provide based on information that you're in the process of producing."), and 218 ("I've not yet reached any final conclusions because I understood there was additional data coming.")).)

Defendants did not seek to postpone Mr. Nolte's deposition.  If Defendants truly wanted to ask Mr. Nolte questions in further detail regarding the damages theory based on the value of Ms. Hilton's promotional services, Defendants could have, and should have, provided the information earlier, or they could have re-scheduled Mr. Nolte's deposition.  They opted to do neither.  Instead, they elected to try to sandbag Mr. Nolte by asking him questions without providing him with information necessary to answer them.

Defendants also fail to point out that Mr. Nolte provided Defendants with preliminary calculations based on the small amount of information that Defendants produced on January 30, 2009, and that Defendants used the calculations as an exhibit at the deposition.  (See Exhibit D.) Defendants did not ask Mr. Nolte any detailed substantive questions regarding those calculations despite having a clear chance to do so.  (See Exhibit E (Nolte Dep. at 247-48).)

To make matters worse, Defendants failed to comply with Magistrate Judge O'Sullivan's February 6, 2009, Order (D.E. 37), and Plaintiff once again had to seek relief.  Specifically, Defendants gave evasive interrogatory answers regarding Ms. Hilton's promotional activities and revenues generated through her promotion.[19]  At a February 26, 2009, hearing, Magistrate Judge O'Sullivan warned Defendants' counsel:  "I already ordered that you respond to this interrogatory, so I don't want to hear again why it is not relevant, and it is ridiculous, that you shouldn't have to do it because we already had this argument a month ago."  (Exhibit J (2/26/09 Transcript at 12).)  Magistrate Judge O'Sullivan thereafter issued his second order on this issue. (D.E. 49.)

---

[19]   Defendants referred Plaintiff to a stack of contracts, among other extraneous documents, that included drafts and unsigned contracts (as to which Defendants' own corporate representative could not confirm whether many of the contracts were ever consummated).

Defendants are also not being candid by suggesting that Mr. Nolte had the information in January and February 2009. (See D.E. 98 at 4.) Defendants' assertion that Plaintiff had this information in January and February 2009 is belied by the fact that, when Magistrate Judge O'Sullivan ordered Defendants to provide the information at the hearing on February 26, 2009, Defendants counsel stated that they needed two weeks to provide the information. Further, Magistrate Judge O'Sullivan warned them:

> Okay. In two weeks you are to provide answers, Mr. Weinsten. I am not in the habit of retreading ground that we have gone over before. So you need to get it right this time. Okay?

(Exhibit J (2/26/09 Transcript at 25).) Defendants' suggestion that they provided the complete information in January and February 2009 is also contradicted by the fact that, on February 26, 2009, Defendants' counsel told Magistrate Judge O'Sullivan that Ms. Hilton did not know the answer as to how much she had been paid for publicity services. (Exhibit J (2/26/09 Transcript at 14).) Magistrate Judge O'Sullivan responded that: "It is hard for me to believe that a corporation that is, you know, producing multi-million dollars of revenues does not know what contracts they have that produce revenue and how much they got for it." (Id. at 21.) Ultimately, Magistrate Judge O'Sullivan issued his February 27, 2009, Order in which he ruled that Defendants "shall provide the particular contracts, the revenue source and the amount of revenue." (D.E. 49.)

In their Reply on their Motion *in Limine*, Defendants argue that they complied with Magistrate Judge O'Sullivan's first order by referencing documents. (See D.E. 98 at 4.) The record is clear that their "reference to documents" did not satisfy the order. In short, merely referring Plaintiff to a 1,021-page range of Bates numbers did not "provide complete substantive responses to the interrogatories" as required in the order. This is confirmed by Magistrate Judge O'Sullivan's comments on the record (as explained above) and the fact that he issued a second order. Frankly, the argument that Defendants make in their Reply is completely outrageous particularly in light of the fact that Defendants' argument to Magistrate Judge O'Sullivan was that ***Defendants*** could not discern the answers to the interrogatories from their ***own*** documents. Thus, for Defendants to argue that Mr. Nolte had the information on February 13, 2009, is disingenuous when Defendants' own counsel told Magistrate Judge O'Sullivan that they did not know the answers to the interrogatories as of February 26, 2009, hearing.

The falsity of Defendants' argument that their March 12, 2009, interrogatory answers were repetitive of the documents that they produced on February 13, 2009, is also demonstrated by the fact the final interrogatory answer appears to contain information regarding oral contracts. If there were oral contracts to pay Ms. Hilton for promotion, there is no way that Plaintiff could have gleaned the information from Defendants' prior document production. The February 6, 2009, Order, required Defendants to "provide complete substantive responses" to the interrogatories. (D.E. 37 at 3.)[20]  Thus, Defendants, in an effort to stonewall Plaintiff, gave Plaintiff a false interrogatory answer by initially (and vaguely) referring Plaintiff to Defendants' document production.

In sum, it was Defendants' own foot-dragging and tactics, including their failures to comply with court orders, that contributed to any delay as to which they are now complaining.

C.     **Mr. Nolte's Opinion Is the Proper Subject of Expert Testimony.**

Defendants' counsel claims that, to prove the "smarter more provable type of damages," he would "get an expert on the stand" to make the calculations. (7/10/09 Trial Tr. at 122.) Defendants, of course, contradict themselves in their Motion *in Limine* (as to their argument that Mr. Nolte's opinion should be partially excluded because allocating the amount paid to Ms. Hilton for publicity for the film is not the subject of expert testimony) by this statement and by claiming that Defendants' "expert", Mr. Shapiro (Ms. Hilton's own personal lawyer), opined that actors are paid "for (i) the actor's performing services and (ii) the right to use the actor's name, voice and image in TV commercials, on billboards, posters, bus-stops, etc." (D.E. 85 at 8.) However, Mr. Shapiro's argument (i.e., that a portion of the payment is for the "actor's performing services") begs the question, particularly since this Agreement specifically entailed

---

[20]     Interrogatory No. 8 required Defendants to "identify all instances in which PHEI or Hilton has determined or estimated a monetary value on Paris Hilton's promotion or publicity services." Interrogatory No. 9 requested "all revenue received by PHEI as a direct result of Paris Hilton providing promotion or publicity services during 2006 and 2007, including each of the sources of such revenue and the amount received from each of the sources of such revenue." Referring Plaintiff to written contracts would not provide a "complete substantive response" if there were oral contracts. In fact, despite the court order, Defendants' counsel instructed Mr. Moore not to provide that information in his deposition. (See Exhibit K (Moore Dep. at 264-65).) Obviously, by instructing his client not to answer the question at his deposition, Defendants' counsel knew that the information was not contained in the documents that Defendants produced in February 2009.

that "Artist shall perform reasonable promotion and publicity services" (see Agreement, §
10.b.i.).

Contrary to Defendants' assertions, Mr. Nolte's conclusions are reliable, relevant, and
admissible. In arguing that Mr. Nolte's opinion should not be allowed, Defendants merely refer
to Mr. Nolte's conclusion that "practically all of the moneys Ms. Hilton was paid for Pledge This
pertain to her promotional activities." However, as indicated in Mr. Nolte's supplemental report,
he analyzed each request for promotion at issue in this matter on a case-by-case basis. In the
end, if certain of the requests at issue in this case did not result in a breach of contract (but other
requests did result in a breach of contract), Mr. Nolte's analysis is highly instructive and useful
for this Court. As clearly stated in his supplement, Mr. Nolte has provided a comprehensive
framework that could result in a finding that the restitution claim is valued up to $1,000,000
depending on the extent of the breaches that are ultimately determined by the Court in this case.

Defendants' argument that the information that they produced was irrelevant is not well
taken. Mr. Nolte's analysis of comparable promotional appearances is based on appearances
made by ***Ms. Hilton***. He is not using what other celebrities have been paid to make a
promotional appearance to apply that to Ms. Hilton. If any data were reliable and relevant, it
would be that regarding Ms. Hilton herself.

### D.   Mr. Nolte's Supplemental Calculation Satisfies the Evidentiary Standards for Expert Opinion.

Defendants' principal challenge to Mr. Nolte is based on Rule 702 of the Federal Rules
of Evidence, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact
> to understand the evidence or to determine a fact in issue, a witness qualified as
> an expert by knowledge, skill, experience, training, or education, may testify
> thereto in the form of an opinion or otherwise, if (1) the testimony is based on
> sufficient facts or data, (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles and methods reliably to
> the facts of the case.

Fed. R. Evid. 702. Mr. Nolte's supplemental opinion satisfies these criteria.

First, Mr. Nolte's testimony is based on sufficient facts or data. Indeed, the information
upon which Mr. Nolte is relying is Defendants' own information. Specifically, Defendants were
required to produce certain information concerning Ms. Hilton's promotional engagements and
the revenues earned as a result thereof. Unless Defendants are claiming that they provided false

information in discovery, they should not be heard to complain about the data upon which Mr. Nolte is relying.   Second, Mr. Nolte's testimony is the product of reliable principles and methods.   Mr. Nolte isolated Ms. Hilton's other comparable promotional engagements from which the amount of money attributed to a specific promotional appearance could be discerned, and such a method is recognized in the field of valuation.   Third, Mr. Nolte applied the principles and methods reliably to the facts of this case by comparing the nature of those promotional engagements to the promotional requests at issue in this case.   This provided Mr. Nolte with a range of values attributable to specific promotional requests.

As the Eleventh Circuit has summarized:

> Expert testimony may be admitted into evidence if: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

City of Tuscaloosa v. Harcros Chemicals, Inc., 158 F.3d 548, 562 (11th Cir. 1998)(footnote omitted), cert. denied, 528 U.S. 812 (1999).

As explained above, Mr. Nolte is qualified to address these issues.   He is a damages expert with expertise in the entertainment industry, and he is applying his experience regarding valuations involving celebrities.   Defendants fail to identify any specifics to suggest that Mr. Nolte is incapable of competently analyzing the value of Ms. Hilton's promotional engagements. His impressive credentials are attached as "Exhibit 1" to his December 19, 2008, report.   (See Exhibit A.)

Mr. Nolte's inquiry is reliable.   While the Daubert factors are illustrative as to reliability, "[t]he district court has wide latitude in deciding how to determine reliability."   United States v. Abreu, 406 F.3d 1304, 1307 (11th Cir. 2005).   As Mr. Nolte states in his supplemental report, "[o]ne accepted method to assess fair market value is an examination of similar transactions." (Exhibit F at 2.)   It is well-established that expert opinions on damages models involving valuations may be based on an examination of comparable business transactions.   See, e.g., Indian Coffee Corp. v. Procter & Gamble Co., 752 F.2d 891, 897-900 (3rd Cir. 1985), cert. denied, 474 U.S. 863 (1985); see also Smith & Parr, Valuation of Intellectual Property and Intangible Assets (2nd Ed. John Wiley & Sons) (noting that market approach is among the

"generally accepted valuation methodologies," that it "provides indications of value by studying transactions of property similar to the property for which a value conclusion is desired," and that "[t]ransactions occurring in a free and open market can serve as a proxy for the property being valued" (excerpt attached hereto as Exhibit L)). In this case, Mr. Nolte looked at what Ms. Hilton was paid for other comparable promotional engagements. As the parties here dispute what Ms. Hilton was paid from the $1,000,000 to promote the Picture, this is clearly a reliable indicator as to the worth of each valid promotional request as to which Ms. Hilton failed to comply.

Mr. Nolte's analysis will certainly assist the trier of fact. Mr. Nolte used his appraisal experience and keen understanding of the entertainment business to synthesize the contracts and revenues disclosed by Defendants to compare Ms. Hilton's other promotional efforts to those at issue here. For example, to the extent that the Court finds that Ms. Hilton's failure to perform a particular promotional task was a breach of the contract, Mr. Nolte's analysis will assist the Court in placing a value on that task based on a restitution theory.

## V.    WITNESSES AND EXHIBITS

In addition to the deposition and trial testimony referenced above, for the restitution damages phase of the case, Plaintiff lists the following persons as live witnesses and the following documents as exhibits.

### A.    David Nolte

Mr. Nolte will testify in accordance with Section B of his December 19, 2008, expert report and the April 9, 2009, supplement thereto. Specifically, it is expected that Mr. Nolte will explain how he categorized certain types of promotional engagements, discerned the fees that Ms. Hilton was paid for those categories of promotional tasks, and compared those promotional efforts to the promotion that is the subject matter of this case. This enabled Mr. Nolte to devise a formula to value the promotional requests that are the subject of this breach of contract action.

### B.    Thomas Campanella

Mr. Campanella is an expert in the area of motion picture marketing. Plaintiff disclosed Mr. Campanella as a rebuttal expert to rebut Defendants' experts on marketing issues.

As of the present juncture, this Court has excluded Defendants' motion picture marketing experts; this Court has also indicated that it "has concluded the trial on liability" (Order at 7). Mr. Campanella, therefore, would only be called to testify to the extent that the Court permits

one or both of Defendants' film marketing experts to testify. If that occurs, the scope of his testimony would depend on the areas covered by Defendants' expert(s).

### C.  Exhibits

Attached hereto is Exhibit M, which is a list of exhibits that Plaintiff offers as additional evidence in the restitution damages phase of the case.

Plaintiff's counsel has conferred with Defendants' counsel regarding Ms. Hilton's contractual documents, and Defendants have indicated that they stipulate to the authenticity of Ms. Hilton's contracts and/or draft/unsigned contracts (obviating the need to use Mr. Shapiro's testimony to authenticate the documents).

### Conclusion

For the foregoing reasons, Plaintiff should be permitted to proceed with his alternative damages model based on the value of the promotional services that Ms. Hilton failed to provide. At a minimum, Plaintiff should be awarded an amount that corresponds to the value of each requested publicity appearance that resulted in a breach of the Agreement by Ms. Hilton. Plaintiff directs the Court to Page 7 of Mr. Nolte's supplemental report, which provides a grid that would enable the Court to value individually the particular publicity request at issue; from there, the Court can extrapolate a value for each breach (i.e., a service for which Pledge This, LLC paid and Ms. Hilton received remuneration but which Pledge This, LLC did not receive).


**TEW CARDENAS LLP**
Counsel for Plaintiff
1441 Brickell Avenue, 15th Floor
Miami, Florida 33131
Telephone: (305) 536-1112
Facsimile: (305) 536-1116

By:  /s/ Thomas G. Schultz
Thomas G. Schultz
Florida Bar No. 92860
Email: tgs@tewlaw.com
Bryan T. West
Florida Bar No. 83526
Email: btw@tewlaw.com

and

**AKERMAN SENTERFITT**
Las Olas Centre II – Suite 1600
350 East Las Olas Blvd.
Fort Lauderdale, Florida 33301
Telephone: (954) 463-2700
Facsimile: (954) 463-2224
Michael I. Goldberg
Florida Bar No. 886602

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed using the CM/ECF system on the 26th of August, 2009, and that counsel on the attached service list were thereby served through the CM/ECF System.

By:  /s/ Thomas G. Schultz

## SERVICE LIST

### CASE NO. 08-22261-CIV-MORENO

Michael E. Weinsten
Daniel Gutenplan
LINER GRODE
1100 Glendon Avenue, 14th Floor
Los Angeles, CA 90024-3503
Telephone:     (310) 500-3603
Facsimile:     (310) 500-3501

Stephen James Binhak
GREENBERG TRAURIG, P.A.
1221 Brickell Avenue
Miami, FL 33131
Telephone:     (305) 579-0862
Facsimile:     (305) 961-5862

*Attorneys for Defendants*

529382.1

30