UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

Case Number: 08-22261-CIV-MORENO

MICHAEL I. GOLDBERG, in his capacity as court-appointed Receiver for Worldwide Entertainment Group, Inc., a Delaware corporation, The Entertainment Group Fund, Inc., a Florida corporation, and other affiliated entities,

    Plaintiffs,

vs.

PARIS HILTON ENTERTAINMENT, INC., a California corporation, and PARIS HILTON, an individual,

    Defendants.
_____/

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

    Plaintiff, Receiver Michael I. Goldberg, sued Defendants Paris Hilton Entertainment, Inc. and Paris Hilton for breach of contract, citing Ms. Hilton's alleged failure to promote the movie *Pledge This!* in compliance with her contract. Having found expectation and reliance damages speculative, what remains at issue in this case is whether Paris Hilton breached her contract when she failed to promote the movie *Pledge This!* and whether Plaintiff, the Receiver, is entitled to restitution due to the failure to promote. Ironically, Paris Hilton, whom the parties have depicted as a promotion machine, argues that the instances where she may have failed to promote *Pledge This!* are worth nothing. She also argues the value of the services she provided under the contract far exceed the million dollars she was paid.

Pursuant to Federal Rule of Civil Procedure 52(a), the Court makes findings of fact and separate conclusions of law. While the Court agrees with Ms. Hilton that on many of the occasions where she was asked to promote the movie, she was professionally unavailable, the Court does find that Ms. Hilton did materially breach the contract by failing to promote the movie on two occasions. Those opportunities to promote occurred on December 26, 2006 when she refused a telephone interview with the Russian edition of *FHM* Magazine and on February 27, March 8 and March 14, 2007, when Ms. Hilton failed to answer written questions posed by United Kingdom publications *Heat* and *Closer*. True that some questions were not approved by Ms. Hilton's handlers, but Ms. Hilton even failed to answer the ones her staff had approved.

The more difficult question is the value of those incidents of failure to promote, when Ms. Hilton was professionally available to comply with her contract. The original damages sought in excess of $8 million were speculative. These damages are not since the Plaintiff did pay Defendants a million dollars as consideration for services under the contract. After reviewing the expert report of Mr. David Nolte, the Court finds that these instances of failure to promote were worth $ 160,000. The record, however, is devoid of evidence on the dollar value of the services performed by Ms. Hilton under this contract as the million dollars she received in compensation were for a bundle of services, including her filming the movie for six weeks, re-shoots of the movie, providing the use of her name and likeness for the movie, assembling the film's cast, a business trip to Cannes, France to promote the movie, various Red Carpet plugs, electronic press kits, and other work. To find Ms. Hilton was unjustly enriched and award the $160,000, the Court must find the services Ms. Hilton did provide do not amount to a million dollars. Accordingly, the Court requests the parties provide expert reports and briefing on this issue by no later than **October 15, 2010**. By that date, the

Defendants will also advise the Court whether they intend to pursue the counterclaim for Ms. Hilton's bonus of $125,000. (Tr. Trans. Vol. I at 350.)

## I. FINDINGS OF FACT

Plaintiff, Michael I. Goldberg, as a court appointed Receiver, filed a complaint for breach of contract against Paris Hilton and Paris Hilton Entertainment, Inc.. Plaintiff claimed that Paris Hilton, a celebrity promoter, failed to keep her end of the bargain, set in a written contract, where Ms. Hilton promised to promote the film *National Lampoon's Pledge This!*, in which she starred in the lead role. While the Receiver agrees that an award of expectation damages would have been speculative, this Court has ruled that reliance damages are likewise speculative. Remaining is whether Defendants breached the contract in failing to fulfill promotional requests and whether Defendants should pay restitution damages for that failure.

Finding that the reliance theory of damages was speculative, the Court ordered the parties to "further brief which portion of the $1 million paid to Ms. Hilton ***specifically compensated her for the promotion of the DVD release only.***" Plaintiff provides the testimony of an expert witness, Mr. David Nolte, who analyzed the value of the publicity services.

### A. The Million Dollar Fee

The contract provides a general compensation clause. It reads as follows:

> As full and complete consideration for the services rendered and to be rendered to Company concerning the picture and for rights granted herein and provided Lender [Paris Hilton Entertainment, Inc.] and Artist [Paris Hilton] are not in material default hereunder, Lender shall be entitled to a fee of one million ($1,000,000) dollars (the "Guaranteed Compensation") on a pay-or-play basis. . .

(Pl. Tr. Exh. 1; Def. Tr. Exh. 515 at ¶2a.) In exchange for the fee, Paris Hilton agreed to do a number of things. She was to provide acting services and her image and likeness for the promotion of the movie. The promotion clause obligated her as follows:

> Artist, agrees that, upon Company's request Artist shall perform reasonable promotion and publicity services, with respect to the Picture including, without limitation, the making and exploitation of so-called "behind the scenes" motion picture documentaries and electronic press kits (which shall be created during principal photography of the Picture), subject to Artist's professional availability and subject to Artist's reasonable approval of behind the scenes interviews, such approval not to be unreasonably withheld or delayed (and such approval to be exercised in the manner set forth in paragraph 7.a. hereinabove). Such services shall not be separately compensated . . .

(Pl. Tr. Exh. 1; Def. Tr. Exh. 515 at ¶10(b)(i).) The promotion clause does not distinguish between promoting a theatrical release or the DVD release, though the contract expressly contemplates a DVD release and foreign releases. (Pl. Tr. Exh. 1; Def. Tr. Exh. 515 at 3.c., 3.f., and 9.b.)

Separate and apart from the promotion clause, the contract contains a provision regarding approvals by the artist. It explains what approvals and consultations the artist retains under the contract. It reads in pertinent part:

> Artist shall have seventy-two hours from receipt by Lender and/or Artist (receipt being deemed to have occurred if such notice is delivered to Artist personally, to Artist's agent and/or Artist's attorneys) of the applicable matter in writing, in which to approve or disapprove such matter. Should Artist fail to respond within such period, such failure shall be deemed an approval.

(Pl. Tr. Exh. 1; Def. Tr. Exh. 515 at 7.a).

The Receiver specifically alleges breaches of the promotion clause on the following

occasions when Mr. Jim DiLorenzo sent publicity requests to Ms. Hilton's handlers:

1. **December 5, 2006**, for failure to agree to publicize the film while in Japan, or upon her return to the Los Angeles area;

2. **December 15, 2006**, for failure to agree to publicize the film while in Japan;

3. **December 21, 2006**, for failure to agree to an interview with the Russian edition of *FHM* magazine;

4. **January 5, 2007**, for failure to agree to appear on either The Late Show with David Letterman or The Tonight Show with Jay Leno;

5. **January 29, 2007**, for failure to agree to interviews with Austrian and German television outlets while in Vienna;

6. **February 23, 2007**, for failure to agree to telephone interviews in connection with an MTV/VH1 satellite radio tour.

7. **February 27, 2007**, for failure to agree to provide interviews to eight United Kingdom publications;

8. **March 8 and 14, 2007**, for failure to agree to provide interviews with two specific British publications, through written questions and answers; and

9. **April 5, 2007**, for failure to agree to an appearance in Japan in May 2007 to publicize the DVD release in that country.

The Court must now decide whether these instances amount to a breach of the contract and whether restitution is appropriate.

*B. Factual Findings Regarding the Breach of Contract*

The evidence undisputedly showed that Paris Hilton did do some promotional work for the film. She attended the Cannes Film Festival and promoted the movie there. (Tr. Trans. Vol. I at 142-43.) Ms. Hilton testified that while in Cannes, France she did a live TV appearance, shared meals with buyers, appeared on the red carpet several times, and provided autographs to promote the

movie. *Id.* She also attended the premiere of the movie in Chicago and promoted it on the red carpet various times, including at the Teen Choice Awards. (Tr. Trans.Vol. II at 138, 244)

Despite this evidence where she undisputedly promoted the movie, the evidence also showed that there came a point in late 2006 where her handlers thought she should move on to her next projects. (Tr. Trans. Vol. II at 317 "[Question:] And Mr. Moore was speaking on behalf of Paris Hilton Entertainment when he said pretty much – we pretty much wanted this film to go away; isn't that correct? [Paris Hilton testifying:] They just meant they wanted me to do my next film.".) The email strings confirm her handler Jason Moore thought she should move on from working on *Pledge This!*. (Pl. Tr. Exh. 94) (Email from Jason Moore to Paris Hilton dated October 19, 2006, stating "My feeling is to just let this one go and be done with it. That was the plan all along and now we cannot try to save this film when it was always going straight to video.".) Over the next few months, Mr. Jim DiLorenzo sent various requests for Paris Hilton to promote *Pledge This!*. The responses from her handlers made it difficult to schedule her for promotions from December 2006 onward. For instance, Ms. Lori Glass, Ms. Hilton's Public Relations agent, stated in an email dated January 12, 2007:

> Paris began production on a film and will be committed to that until mid-February. From there she will have to fulfill her prior commitments that have been on calendar for several months. Moving forward, she is fully committed until mid-May. Publicity requests taking place after May . . . as well as following months will always be dependent on Paris' availability. As you have witnessed, Paris' schedule is a constant work in progress and is always changing. Please feel free to continue to send requests to me and as always I will do my best to facilitate. More than that I simply cannot promise.

(Pl. Tr. Exh. 27.) Following this email, the requests continued to come in, but Ms. Hilton did not

-6-

do any promotion after that date.

There is no doubt that Paris Hilton was very busy during the time period in question. The Court must decide whether the evidence establishes her professional unavailability on the nine instances in questions or whether she breached the contract by failing to comply with the publicity requests.

### 1. December 5, 2006 Publicity Request

Two weeks before the domestic release of the *Pledge This!* DVD, Executive Producer Jim DiLorenzo forwarded to Ms. Hilton's representatives the first request for DVD publicity from Vivendi Visual Entertainment on December 5, 2006. The DVD release was scheduled for December 19, 2006. The request reads as follows:

> We would greatly appreciate your participation on a few talk shows during street week or shortly thereafter to promote this release. We have narrowed down the following shows whose audience we believe is ideally suited for this release --- Jay Leno, Jimmy Kimmel, EXTRA. Please advise with your availability schedule and we will make all the arrangements to finalize the dates.

(Pl. Tr. Exh. 7.) The testimony did show that she was not available between December 15-19, 2006 because she was in rehearsals for a new film, *Hottie & The Nottie*. (Tr. Trans. Vol. II at 174.) Following those dates, the evidence showed Ms. Hilton was on business in Tokyo and Sydney and did not return to Los Angeles until January 2, 2007. (Tr. Trans. Vol. II at 192.) She also spent Christmas with her family in Hawaii for two days. (Tr. Trans. Vol. II at 191.) The Court does find the evidence credible that she was professionally unavailable during that time.

### 2. December 15, 2006 Promotion Request

Three days before Ms. Hilton left for Tokyo to do a promotional appearance for Motorola, Mr. DiLorenzo asked whether Ms. Hilton would have time while there to do some unspecified publicity for the Japanese distributor, Gaga. Ms. Hilton testified that during her brief stay in Japan, her schedule was entirely booked with events. (Tr. Trans. Vol. II at 211.) However, even if Ms. Hilton had a few hours to do some *Pledge This!* publicity, as she testified, her Japanese licensees would not permit her to promote someone else's product while she is in Japan to promote their product.(Tr. Trans. Vol. II at 177- 178 "[Paris Hilton testifying:] I was exclusive with Motorola . . . They wouldn't let me talk about anything else but the Motorola.".)

There is no evidence that Ms. Hilton failed to timely respond that she could not oblige this request. Not only was the request on short notice, but it also would impede her ability to comply with other contractual obligations. Accordingly, the Court does not find that Ms. Hilton breached the contract in this instance as she was professionally unavailable to comply with this request.

  3.    **December 21, 2006 Promotion Request**

On December 21, 2006, Mr. DiLorenzo asked whether Ms. Hilton would be available to do a phone interview with the Russian edition of *FHM* magazine. The request came in while Ms. Hilton was in Tokyo and shortly before she left for Sydney. The evidence showed that immediately after she returned from Sydney she started work on her film, *Hottie & The Nottie*, which did not conclude until February 17, 2007. (Tr. Trans. Vol. II at 188-89.) On December 21, 2006, Mr. DiLorenzo sent the request to Ms. Hilton's handlers Jason Moore and Lori Glass. It reads in part that "The Russian edition of *FHM* Magazine would like to have a phone interview with Paris to support the February theatrical release in that country. Please advise what day/week we can target to schedule." (Pl. Tr. Exh. 13.)

This request allowed Ms. Hilton to pick a date and time for the interview and the evidence showed that her handlers failed to respond to the request. As to this request, which was for a telephone interview, the Court does not find Ms. Hilton was professionally unavailable. Because the request provided some flexibility as to date and time, the Court cannot find that she was unavailable. That she would not have agreed to the request because it was not for the cover of *FHM* magazine is immaterial as her handlers failed to respond to that effect within 72 hours as required by the contract. (Tr. Trans. Vol. II at 322) (testimony by Ms. Hilton stating she would only do *FHM* cover and she does not say whether she knew how her handlers had responded to the request.) Accordingly, the Court does find this failure amounts to a breach of the contract's promotion clause.

### 4. January 5, 2007 Promotion Request

In early January 2007, Mr. DiLorenzo renewed the request for Ms. Hilton to appear on Jay Leno to promote *Pledge This!*. (Pl. Tr. Exh. 18.) Ms. Hilton testified that she had a conflict due to her loyalty to David Letterman and Mr. Moore relayed that to Mr. DiLorenzo. *Id.* (Email from Jason Moore to Jim DiLorenzo "We have already been contacted by David Letterman, Jay would be a direct conflict. Lori will advise when we proceed with Letterman.")

Ms. Hilton's testimony was that her handlers tried to get her on Letterman to promote *Pledge This!*, but shooting on the *Hottie & The Nottie* ultimately conflicted with a Letterman appearance. (Tr. Trans. Vol. II at 208 Ms Hilton: "Well, I love Letterman. He's like my favorite nighttime host. And they wanted me to do it, and they wanted me to book it; but I was still shooting the movie so I couldn't.".) Due to her professional unavailability and her responsiveness to the request, the Court does not find this failure constitutes a breach of contract.

### 5. January 29, 2007 Promotion Request

Two weeks before Ms. Hilton left for Austria, Mr. DiLorenzo made an inquiry as to whether or not Ms. Hilton would have time on that trip for an interview with German and Austrian television. Mr. DiLorenzo did not specify what the interview would entail, how long it would take, who it would be with, or any other details. (Pl. Tr. Exh. 30) (Email from Jim DiLorenzo to Jason Moore: "In regards [to] her upcoming trip to Austria, I know our German distributor (Telepol) would be very interested in organizing an interview for German and Austrian television. Would her schedule permit anything like this?".) The evidence showed that Ms. Hilton was professionally unavailable as she was busy promoting another product (Rich Prosecco) during the trip and her failure to promote the movie on German and Austrian television did not constitute a breach of the contract. (Tr. Trans. Vol. II at 211, 269.)

### 6. February 23, 2007 Promotion Request

Four months after the film was released and over two months after the domestic DVD release, Mr. DiLorenzo asked whether Ms. Hilton would participate in an MTV/VH1 satellite radio tour for *Pledge This!*. (Pl. Tr. Exh. 36.) The evidence showed Ms. Hilton was en route from Puerto Rico on the date of the request and then she was scheduled for a late February photo shoot. (Tr. Trans. Vol. II at 214.) In early March, she started work on her tv show *The Simple Life*. (Tr. Trans. Vol. II at 215.) While on *The Simple Life*, Ms. Hilton testified that she did not have access to a landline, which was required to do the radio interview. (Tr. Trans. Vol. II at 225-226.) The testimony also establishes that radio tours are generally very difficult given the different time zones. Although this request involved a phone interview, the Court finds Ms. Hilton was professionally unavailable to comply with this request due to her obligations on *The Simple Life*. Accordingly, the

Court does not find her failure to fulfill this request amounted to a breach of contract.

7. **February 27, 2007 and March 8 and 14, 2007 Promotion Requests**

On February 27, 2007, Mr. DiLorenzo forwarded a request for Ms. Hilton to do a sit down interview and one or more phone interviews with British tabloid magazines. Later in March, there were requests to do written questions and answers with eight British tabloids. Mr. DiLorenzo subsequently revised his request to focus on written interviews with two magazines, *Heat* and *Closer*. (Pl. Tr. Exh. 44.)

Mr. Moore and Ms. Glass, Ms. Hilton's handlers, requested to see the interview questions in advance. Some questions related to Ms. Hilton's personal life and not her work on the film. On this request, it seems the Defendants' handlers approved certain questions and declined others. Despite approving the questions, the written answers were never provided. (Pl. Tr. Exh. 50, 51.) The Court finds this request was reasonable and Ms. Hilton has not shown she was professionally unavailable to comply. Indeed, it seems that her handlers had at least partially agreed to the substance of the interviews.

8. **April 5, 2007 Promotion Request**

On April 5, 2007, Mr. DiLorenzo inquired about a possible May appearance in Japan to do unspecified publicity. (Pl. Tr. Exh. 60) (Email from Jim DiLorenzo to Jason Moore dated April 5, 2007 requesting appearance in Japan.) Ms. Hilton had planned to go to Japan in mid-May for an appearance on behalf of the brand Samantha Thavasa. (Tr. Trans. Vol. II at 229.) As explained by Ms. Hilton and Mr. Moore, this brand would not have permitted Ms. Hilton to do other publicity while she was there to promote their product, even if she had the time. (Tr. Trans. Vol. II at 230.)

Regardless, the trip was cancelled and rescheduled after Ms. Hilton was sentenced. (Tr. Trans. Vol. II ar 231.) Even if Ms. Hilton had traveled to Japan, she would not have been able to comply with this request. Accordingly, the Court does not find that her failure to comply with this request amounted to a breach of contract.

*C. Plaintiff's Expert David Nolte's Report and Supplemental Report[1]*

Mr. Nolte put forward two damages theories, one for reliance damages and one entailing a valuation of Ms. Hilton's promotional services based on a "fair market value" of such promotional services. Mr. Nolte concludes that the "lost value of Ms. Hilton's promotional efforts for *Pledge This!* equals practically all of the $1 million that Ms. Hilton was paid."

Mr. Nolte explains that his conclusions were based on an analysis of two categories of contracts where Ms. Hilton got paid to do promotional events: (Category 1) "10 contracts for Ms. Hilton's physical presence at a specific location, including any scripted or non-meaningful speaking"; and (Category 2) "4 contracts for Ms. Hilton's participation in one or more promotional events, where some type of unscripted speaking in an interview setting is required." He also included promotional events that required an interview, but not necessarily Ms. Hilton's physical presence, in Category 1.

Using these contracts, Mr. Nolte appears to calculate an average of what Ms. Hilton got paid for each category of promotional activity: $80,000 for a Category 1 event and $120,000 for a Category 2 event. He then applies these averages to the alleged breaches in this case and sums the results. He concludes that the restitution damages are between $1 million and $1.6 million -- a sum

---

[1] Admitted into the record at oral argument on April 29, 2010 and attached to Plaintiff's Trial Brief on Restitution Damages at Exhibits A and F (D.E. No. 140)

in excess of what Paris Hilton got paid on this contract.

Defendants argue Mr. Nolte's analysis is flawed because he examines what Ms. Hilton is compensated for promotions in the non-film context. Defendants claim that what Ms. Hilton gets paid to appear at a nightclub has no correlation to what she gets paid to promote a movie. Defendants also claim Mr. Nolte fails to value the benefit the producers received from Ms. Hilton's acting services on the film and the use of her image and likeness.

## II. CONCLUSIONS OF LAW

Restitution damages are based on the theory of unjust enrichment. *Bausch & Lomb, Inc. v. Bressler*, 977 F.2d 720, 729 (2d Cir. 1992). Under this theory, upon a showing of a "material" breach by defendant, a plaintiff may be able to recover "the reasonable value of services rendered, goods delivered, or property conveyed less the reasonable value of any counter-performance received by him." *Id.* "The objective of restitution is to return the parties, as nearly as practicable, to the situation in which they found themselves before they made the contract." *See* Restatement (Second) of Contracts § 384, cmt. a (2010).

    A.    *Materiality of the Breach*

Before determining what sum Plaintiff is entitled to in restitution, the Court must first determine whether the failure to promote was a material breach of the contract, a necessary precondition to such an award. Restatement (Second) Contracts § 373(1), cmt. a (2010) ("If, however, the breach is by non-performance, restitution is available only if the breach gives rise to a claim for damages for total breach and not merely to a claim for damages for partial breach.");

*Abdul v. Subbiah*, 735 N.Y.S.2d 29, 30 (2001) (adopting § 373 of the Restatement (Second) Contracts in New York and the rule that restitution is available only for non-performance which amounts to a "total breach" of contract.).

A total breach is defined as one that "so substantially impairs the value of the contract to the injured party at the time of the breach that it is just in the circumstances to allow him to recover damages based on all his remaining rights to performance." Restatement (Second) of Contracts §§ 243(4), 373 (2010); *Hansen Bancorp, Inc. v. United States*, 367 F.3d 1297, 1309 (Fed. Cir. 2004). Under New York law, a breach is material if it "is so substantial that it defeats the object of the parties in making the contract"; the breach must go to the root of the agreement between the parties. *Qualcomm Inc. v. Texas Instruments, Inc.*, 875 A.2d 626, 628 (Del. 2005). The evidence at trial showed that the promotion clause of the contract was central to the agreement. (Pl. Tr. Exh. 1 at 6) Given the undisputed evidence that Paris Hilton is a promotion machine, her failure to promote the movie on the two instances is material. (Tr. Trans. Vol. I at 74.) Moreover, while the Court recognizes Ms. Hilton did not have an obligation to promote this film indefinitely, the evidence showed that at some point, her agents intentionally abandoned her obligation to promote this movie, knowing it was unsuccessful. While it is a close decision, given the abandonment of her promotional responsibilities under the contract and her role as a promotion machine, the Court finds the two breaches were material.

   B.  Restitution

Having found the two breaches were material, the Court may award restitution. In *Bausch & Lomb*, the Second Circuit acknowledged that Plaintiff could seek return of some portion of a

$500,000 payment made to defendant in exchange for an exclusive license that was breached. *Bausch & Lomb*, 977 F.2d at 730. In this case, Plaintiff is seeking to recover for work the company paid, which Ms. Hilton did not perform. There is an issue as to whether restitution damages could be established with reasonable certainty. *Zink v. Mark Goodson Prod., Inc.*, 689 N.Y.S.2d 87, 88 (1999) (finding damages must be established with reasonable certainty and may not be recovered if they are too speculative, vague or contingent).

Defendants' position is that Mr. Nolte's damages model is too speculative to award restitution. True the report does not fashion a damages model based on restitution, but it is instructive to determine what portion of the million dollar fee can be attributed to publicity. At Mr. Nolte's deposition, Mr. Nolte indicated that his "analysis [tried] to determine what portion of the million dollars is attributable to her publicity services." (Nolte Dep. at 226.)

Mr. Nolte's supplemental report examines in detail Ms. Hilton's compensation for promotional activities. (Exh. F to Pls.' Brief on Restitution Damages.) Mr. Nolte took the publicity requests at issue in this case and compared them to the types of publicity services that Ms. Hilton has provided on other occasions. In doing so, he divided promotional tasks into different categories depending on the level of commitment required by Ms. Hilton. Category 1 engagements, for example, provide for scripted speaking. Neither of the breaches, the Court has found, involve a personal appearance by Ms. Hilton – one was a phone interview and the other a written question and answer with foreign press. Mr. Nolte categorized both as Category 1 events.

Mr. Nolte categorized the written answers with the two British publications *Heat* and *Closer* as a Category 1 event. In an effort to be conservative, he combined the two written questions and answers into one Category 1 event, especially because Ms. Hilton need not appear. Mr. Nolte

determined that the average sum Ms. Hilton would be compensated for such an activity was $80,000. As for the interview with *FHM* magazine, Mr. Nolte categorized that as a Category 1 promotional event, for which Ms. Hilton's average compensation is also $80,000. The Court finds Mr. Nolte's analysis both reasonable and fair. Moreover, it is based on amounts for which the services could be purchased at time when services were rendered. *United States v. Zara Contracting Co.*, 146 F.2d 606, 611 (2d Cir. 1944); *Bausch & Lomb*, 977 F.2d at 730 (stating that court may look to "readily available market price" to determine valuation measure).

Having found the value of the two breaches to be worth $160,000, the Court must determine whether any offset is due given the services Ms. Hilton did provide under the contract. *Bausch & Lomb*, 977 F.2d at 729-30 (finding any benefits received by the plaintiff were required to be offset against the amount paid). Put another way, Plaintiff is only entitled to restitution if it received less in value than the million dollars it paid Ms. Hilton. The Court must examine the evidentiary grounds to determine what portions of the million paid to Ms. Hilton was consideration for her various roles in this project, including, for example, her acting services ($65,000 according to Pl. Tr. Exh. 2) and her executive producer services ($935,000 according to Pl. Tr. Exh. 2.). As part of her executive producer duties, she was required to promote the motion picture. (Tr. Trans. Vol. II at 245 ("[Question:] And as an executive producer of the film, did you have an interest in trying to promote the film? [Paris Hilton testifying:] Yes. And I did promote the film as much as possible.").

Neither the contract nor the amendment spell out exactly what the fee is compensating. Rather, there is a general compensation fee for a bundle of services Ms. Hilton was to provide. The record, however, is devoid of evidence on the dollar value of the services performed by Ms. Hilton under this contract. The million dollars she received in compensation were for a bundle of services,

including her filming the movie for six weeks, re-shoots of the movie, providing the use of her name and likeness for the movie, assembling the film's cast, the trip to Cannes, France to promote the movie, various Red Carpet plugs, electronic press kits, and other work. To find Ms. Hilton was unjustly enriched and award the $160,000, the Court must find these services do not amount to a million dollars. Accordingly, the Court requests the parties provide expert reports and briefing on this issue by no later than **October 15, 2010**.

DONE AND ORDERED in Chambers at Miami, Florida, this 31st day of August, 2010.

_____
FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

Copies provided to:

Counsel of Record